Nos. 12-1081 and 12-1213

IN THE

# United States Court of Appeals
## *for the*
## Seventh Circuit

ROBERT LEIMKUEHLER, as Trustee of and on Behalf of
LEIMKUEHLER, INC. PROFIT SHARING PLAN,
and on behalf of all others similarly situated,

*Plaintiff-Appellant/Cross-Appellee,*

— against —

AMERICAN UNITED LIFE INSURANCE CO.,

*Defendant-Appellee/Cross-Appellant.*

On Appeal from the United States District Court
for the Southern District of Indiana (10-CV-333-JMS-TAB)
The Honorable Jane Magnus-Stinson, Presiding

**BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT ROBERT LEIMKUEHLER**

Robert L. King
Korein Tillery LLC
505 N. 7th Street, Suite 3600
St. Louis, Missouri 63101-1625
Direct: (314) 450-4046

Klint L. Bruno
Korein Tillery LLC
205 N. Michigan, Suite 1940
Chicago, Illinois 60601-4269
Direct: (312) 899-5065

*Attorneys for Appellant Robert Leimkuehler*

Kathleen A. DeLaney
DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, Indiana  46205
Phone: (317) 920-0400

Eric H. Zagrans
Zagrans Law Firm LLC
24500 Chagrin Boulevard, Suite 200
Cleveland, Ohio 44122
Phone: (216) 771-1000

*Additional Counsel for Appellant Robert Leimkuehler*

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-1081, 12-1213

Short Caption: Robert V. Leimkuehler vs. American United Life Insurance Co.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Robert V. Leimkuehler, Trustee of the Leimkuehler, Inc. Profit Sharing Plan

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Korein TIllery LLC; Zagrans Law Firm, L.P.A., DeLaney & DeLaney LLC

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Klint Bruno          Date: 5/24/12

Attorney's Printed Name:  Klint Bruno

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X   **No**  _____

Address:  205 N. Michigan Ave., Suite 1940, Chicago, Illinois  60601

Phone Number:  312-899-5065          Fax Number:  312-641-9751

E-Mail Address:  kbruno@koreintillery.com

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: _12-1081, 12-1213_

Short Caption: _Robert V. Leimkuehler vs. American United Life Insurance Co._

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   _Robert V. Leimkuehler, Trustee of the Leimkuehler, Inc. Profit Sharing Plan_

   _____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   _Korein Tillery LLC; Zagrans Law Firm, L.P.A.; DeLaney & DeLaney LLC_

   _____

   _____

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      _N/A_

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      _N/A_

Attorney's Signature: _s/  Robert L. King_          Date: _2/16/2012_

Attorney's Printed Name: _Robert L. King_

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __✕__

Address: _505 N. 7th Street, Suite 3600, St. Louis, Missouri 63101_

   _____

Phone Number: _(314) 450-4046_          Fax Number: _(314) 863-7902_

E-Mail Address: _rking@koreintillery.com_

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-1081

Short Caption: Robert Leimkuehler, et al.  v. American United Life Insurance Co.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Robert Leimkuehler, as trustee of and on behalf of Leimkuehler, Inc. Profit Sharing Plan and on behalf of all

others similarly situated

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

DeLaney & DeLaney LLC; Korein Tillery LLC; Zagrans Law Firm LLC

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: /s/  Kathleen A. DeLaney                          Date: 01.19.12

Attorney's Printed Name: Kathleen A. DeLaney

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ⨯      **No** _____

Address: 3646 N. Washington Blvd. Indianapolis, IN 46205

Phone Number: 317-920-0400                    Fax Number: 317-920-0404

E-Mail Address: kathleen@delaneylaw.net

rev. 01/08 AK

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: _12-1081, 12-1213_

Short Caption: _Robert V. Leimkuehler vs American United Life Insurance Co._

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

_Robert V. Leimkuehler, Trustee of the Leimkuehler, Inc., Profit Sharing Plan_

_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_Korein Tillery LLC; Zagrans Law Firm, L.P.A.; DeLaney & DeLaney LLC_

_____

_____

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   _N/A_

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   _N/A_

Attorney's Signature: _s/  Eric Zagrans_                         Date: _May 25, 2012_

Attorney's Printed Name: _Eric Zagrans_

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _☓_   **No** _____

Address: _24500 Chagrin Boulevard, Suite 200, Cleveland, OH  44122_

_____

Phone Number: _216-771-1000_                    Fax Number: _216-360-7440_

E-Mail Address: _eric@zagrans.com_

rev. 01/08 AK

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Table of Authorities .................................................................................................... iii

Jurisdictional Statement ............................................................................................. 1

Statement of Issues ...................................................................................................... 2

Statement of the Case ................................................................................................. 3

Request for Oral Argument ........................................................................................ 5

Statement of Facts ....................................................................................................... 6

    A. The Trustee and the Leimkuehler Plan........................................................ 6

    B. 401(k) Plan Background. ................................................................................ 6

    C. Mutual Funds and Mutual Fund Share Classes. ........................................ 7

    D. AUL's Fee Practices and "Revenue Sharing." ......................................... 10

    E. AUL Unilaterally Selects Mutual Funds and their Share Classes. ....................................... 13

Summary of Argument ............................................................................................. 14

Argument .................................................................................................................... 16

I.   Standard of Review.............................................................................................. 16

II.  Evidence of AUL's Authority and Control of Plan Assets Precluded Summary
    Judgment on Fiduciary Status.......................................................................... 16

    A. The exercise of *any* authority or control over management or disposition of plan
       assets gives rise to fiduciary status. .................................................... 17

       1. Rules of statutory construction foreclose the district court's holding that "any
          authority or control over management or disposition of [plan] assets" means
          "discretionary authority or control."............................................................18

       2. The district court's holding requiring discretionary authority or control conflicts
          with the law in eight circuits and with Department of Labor's interpretation. ...............19

       3. This Court's decisions did not compel the district court's holding that authority
          or control over management or disposition of plan assets must be discretionary............21

B.  The ability to move and transfer assets constitutes "authority or control over the management or disposition" of those assets. ...................................... 23

C.  The evidence of AUL's authority and control of plan assets precluded entry of summary judgment for AUL. ...................................... 25

1.  AUL exercises authority and control over the disposition of plan assets. ...................... 25

2.  AUL exercises authority and control over the management and disposition of plan assets in AUL's separate account. .......................... 28

III. The District Court's Finding That AUL Selects Share Class Precluded Summary Judgment on Fiduciary Status. ................................. 29

IV. The District Court Erred in Refusing to Dismiss All of AUL's "Contingent" Counterclaims. .................................... 34

A.  The district court erred in refusing to dismiss all of AUL's counterclaims for indemnity and contribution. ................................ 36

1.  Courts have held that there is no contribution or indemnity remedy under ERISA, including in a revenue sharing case like the present one. ................. 36

2.  AUL is not entitled to indemnity because *Free* recognized only a limited right to indemnification where a *passive* trustee seeks indemnification from a more culpable *active* trustee. ............................ 37

B.  AUL failed to state a counterclaim on behalf of the Plan for the Trustee's alleged breach of fiduciary duty. ............................... 40

1.  AUL failed to allege any cognizable loss to the Plan. ................................... 41

2.  AUL alleges no facts supporting its "unadorned" and conclusory allegation that the Trustee breached his fiduciary duties to the Plan. ................... 41

Conclusion ............................................................ 43

Certificate of compliance with Rule 32(a) requirements ................. 44

Circuit Rule 30(d) statement ........................................ 45

Short Appendix Table of Contents ................................... 47

## TABLE OF AUTHORITIES

### CASES

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) ........................................................... 18

*Alton Mem'l Hosp. v. Metropolitan Life Ins. Co.*, 656 F.2d 245 (7th Cir.1981) ..................................... 40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 38–39

*Baker v. Kingsley*, 387 F.3d 649 (7th Cir. 2004) ................................................................. 22

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) ........................................................... 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 39

*Board of Trustees of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assoc., Inc.*, 237 F.3d 270 (3d Cir. 2001) ................................................................................... 20

*BP Corp. N. Am., Inc. v. Northern Trust Invs., N.A.*, 692 F. Supp. 2d 980 (N.D. Ill. 2010) ........... 36–38

*Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006) ........................................................ 24, 26–27

*Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006) ........................................ 16, 19–21, 23–26

*Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008) ................................... 37

*Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12 (2d Cir. 1991) ........................................ 36

*Cohen v. City of Des Plaines*, 8 F.3d 484 (7th Cir. 1993) ..................................................... 16

*Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119 (7th Cir. 1987) ................................................ 21

*Coldesina v. Estate of Simper*, 407 F.3d 1126 (10th Cir. 2005) ...................................... 20, 24, 26–27

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ....................................................... 18

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) ...................... 16, 39

*FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907 (8th Cir. 1994) ................................................. 19, 20

*Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984). .................................................... 36–39

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ........................................... 36

*Haddock v. Nationwide Fin. Servs., Inc.*, 272 F.R.D. 61 (D. Conn. 2010), ............................... 42–43

*Hart v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 360 F.3d 674 (7th Cir. 2004) .............. 21

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ..................................................... 32–33

*Herman v. NationsBank Trust Co., (Georgia)*, 126 F.3d 1354 (11th Cir. 1997) ................................... 19

*IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415 (9th Cir. 1997) ...................... 19, 23–24, 26–27

*Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184 (7th Cir. 1994) ............................................ 23, 26, 32

*Kim v. Fujikawa*, 871 F.2d 1427 (9th Cir. 1989) ............................................................ 36

*Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011) ................................................... 22

*LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997)................................................... 19, 23

*Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)................................... 36

*Mertens v. Hewitt Assoc.*, 508 U.S. 248 (1993).......................................................... 17, 36

*Nauman v. Abbott Laboratories*, 669 F.3d 854 (7th Cir. 2012)...................................... 17

*Pegram v. Herdrich*, 530 U.S. 211 (2000)..................................................................... 17

*Pohl v. National Benefits Cons., Inc.*, 956 F.2d 126 (7th Cir. 1992) ........................... 21–22

*Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633 (7th Cir. 1986) ............... 21

*Russello v. United States*, 464 U.S. 16 (1983) .............................................................. 18

*Sarnoff v. American Home Prod. Corp.*, 798 F.2d 1075 (7th Cir. 1986) ...................... 22–23

*Sharp Elecs. Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505 (7th Cir. 2009) .................. 40

*Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir. 2006)........................... 37

*Travelers Cas. and Sur. Co. of Am. v. IADA Servs., Inc.*, 497 F.3d 862 (8th Cir. 2007)......................... 36

*United States v. Berkos*, 543 F.3d 392 (7th Cir. 2008). ................................................... 18

*United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988)........................................... 22–23

*United States v. Gonzales*, 520 U.S. 1 (1997) ........................................................... 18–19

*United States v. Jallali*, No. 11-11737, 2012 WL 1579326 (11th Cir. May 7, 2012) ...................... 38

*United States v. Rosenbohm*, 564 F.3d 820 (7th Cir. 2009)............................................. 18

*United States v. Wong Kim Bo*, 472 F.2d 720 (5th Cir. 1972) ......................................... 18

*Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998) ............................................................. 23

*Wilson v. DaimlerChrysler Corp.*, 236 F.3d 827 (7th Cir. 2001) ..................................... 16

**STATUTES**

28 U.S.C. § 1291................................................................................................... 1

28 U.S.C. § 1331................................................................................................... 1

29 U.S.C. § 1002(17)............................................................................................. 9

29 U.S.C. § 1002(21)(A)........................................ 2, 16, 18, 19–23, 31, 33–34

29 U.S.C. § 1104(a) ............................................................................................... 5

29 U.S.C. § 1105 ........................................................................................ 2, 40, 42

29 U.S.C. § 1106(b)(3) ..................................................................................... 5

29 U.S.C. § 1109(a) ........................................................................................ 41

29 U.S.C. § 1132 .............................................................................................. 1

## REGULATIONS

29 C.F.R. § 2510.3-101(h)(1)(iii) ................................................................. 25

29 C.F.R. § 2510.3-102(a)(1) ........................................................................ 25

## OTHER AUTHORITIES

Brief of the Secretary of Labor as Amicus Curiae Supporting Appellants, *McLemore v. Regions Bank*, No. 10-5480 (6th Cir. Nov. 19, 2010) (available at http://www.dol.gov/sol/media/briefs/mclemore(A)-11-19-2010.htm) ..................................... 19

Brief of the Secretary of Labor as Amicus Curiae Supporting Plaintiff, *McLemore v. Regions Bank*, 2008 WL 5425491 (M.D. Tenn.) .................................... 19

Field Assistance Bulletin 2004–03 (Dep't of Labor Dec. 17, 2004) ............................................. 19

Restatement (Second) of Trusts § 258 .............................................. 38

**JURISDICTIONAL STATEMENT**

This is an ERISA suit filed pursuant to 29 U.S.C. § (a)(3) against American United Life Insurance Company for breach of its fiduciary duties and prohibited transactions. ERISA suits are within the exclusive jurisdiction of federal district courts. 29 U.S.C. § 1132(e). Thus, the district court had federal question jurisdiction. 28 U.S.C. § 1331.

The district court entered final judgment in favor of AUL on January 6, 2012. JA4. The Trustee filed a timely notice of appeal on January 10, 2012. JA1. This Court accordingly has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. The first issue concerns the interpretation of the second clause of 29 U.S.C.

   § 1002(21)(A)(i), one of ERISA's definitions of "fiduciary." Subsection 1002(21)(A)(i)

   provides:

   > ... a person is a fiduciary with respect to a plan to the extent (i) he exercises
   > any discretionary authority or discretionary control respecting management
   > of such plan or exercises any authority or control respecting management or
   > disposition of its assets[.]

   The first question presented is:

   Whether the district court erred by interpreting "any authority or control" to require

   discretionary "authority or control" to support a finding of fiduciary status?

2. Whether the district court erred by concluding that AUL's receipt, transfer, valuation,

   and investment of plan assets did not constitute the requisite exercise of "any authority or

   control respecting management or disposition of [the Plan's] assets" to support a finding

   of AUL's fiduciary status?

3. Whether the district court erred by concluding that AUL does not exercise the requisite

   "authority or control respecting management or disposition of [the Plan's] assets" to

   make AUL a fiduciary of the Plan, despite the court's factual finding that "AUL alone

   decides which [mutual fund] share class" the Plan will invest in but "does not specifically

   disclose to the Plan ... the different share classes available or the one that it has selected"?

If the Court reverses the district court's judgment, there are two additional questions

presented for review concerning three counterclaims AUL asserted below. AUL asserted, as a co-

fiduciary, counterclaims against the Trustee for indemnity and contribution "under ERISA," and

as a fiduciary "on behalf of the Plan and its participants" a counterclaim against the Trustee

under 29 U.S.C. § 1105, ERISA's co-fiduciary liability provisions. AUL pled the counterclaims as contingent on it being held to be a fiduciary of the Plan under ERISA. In each count, AUL's sole allegations of wrongdoing are that the Trustee breached his duties to the Plan by failing "to ensure that AUL did not breach any fiduciary duty" to the Plan and by failing "to prevent AUL from committing a breach."

4.    Whether AUL's allegations are insufficient to state viable claims for indemnity or contribution?

5.    Whether AUL's allegations are insufficient to state a viable claim for co-fiduciary liability under 29 U.S.C. § 1105?

## STATEMENT OF THE CASE

The Trustee of the Leimkuehler, Inc. Profit Sharing Plan, a 401(k) retirement plan, filed this case as a class action alleging that American United Life Insurance Company (AUL) is an ERISA fiduciary of the Plan and that some of AUL's 401(k) fee practices violate ERISA's fiduciary provisions. Specifically, the Trustee contends that AUL is an ERISA fiduciary by virtue of AUL's exercise of authority and control over the management and disposition of plan assets that AUL holds in an insurance company separate account that it owns and over which it has exclusive control. Among the assets AUL holds in that account are the Plan's 401(k) contributions, which AUL ultimately invests in mutual funds chosen by the Plan and its participants from among those AUL offers. While the Plan's participants decide in which mutual funds to invest their contributions, AUL decides in which share class of those mutual funds participants' contributions would be invested (as the district court expressly found as a matter of fact). AUL's selection of

share classes is thus a second, significant way in which AUL exercises fiduciary authority and control over the Plan's assets.

Through an undisclosed arrangement between AUL and the mutual funds included in its 401(k) investment platform, the mutual funds pay AUL a portion of the fees they charge to the Plan for managing its investments. These payments, referred to in the 401(k) industry as "revenue sharing," are a percentage of the total 401(k) assets AUL invests in a mutual fund, and those percentages vary depending on the share class. Thus, because AUL decides in which share classes the Plan's assets will be invested, AUL determines the percentage amount it will receive in revenue sharing payments. Prior to the Trustee's lawsuit, AUL did not disclose the amounts or even the existence of revenue sharing to its 401(k) plans or their participants.

The Trustee claims that AUL's revenue sharing practices violate ERISA because AUL did not disclose the revenue sharing payments to the Plan and because AUL did not give the Plan an offset for those payments against the fees the Plan paid to AUL for its services. Specifically, the Trustee alleged that these practices, without full disclosure and without a dollar-for-dollar offset, constituted both a breach of fiduciary duty and prohibited self-dealing in violation of 29 U.S.C. § 1104(a) and 1106(b)(3).

AUL first moved for judgment on the pleadings. The district court granted AUL's motion on a non-fiduciary claim the Trustee had asserted and certain other fee practice allegations, but the Trustee's primary claims for breach of fiduciary duty and prohibited transactions based on AUL's revenue sharing practices survived.

Next, AUL filed five counterclaims against the Trustee, all of which were expressly contingent on the Trustee prevailing one on or more of the Plan's claims against AUL. AUL asserted two counts for indemnity and two for contribution. It also asserted a fifth count in its fiduciary capacity on behalf of the Plan against the Trustee for failing to prevent AUL from

breaching its fiduciary duties. The Trustee moved to dismiss AUL's counterclaims, and the district court granted that motion with respect to the indemnity and contribution claims AUL asserted based on federal common law, but allowed the other three counter-claims to proceed.

After the Trustee moved for class certification, AUL moved for summary judgment, arguing that it was not a fiduciary. In early 2012, the district court granted AUL's motion, entered final judgment in favor of AUL, and the Trustee timely filed this appeal.

## REQUEST FOR ORAL ARGUMENT

This case meets the standards of Rule 34(a)(2) for oral argument:  1) the appeal is not frivolous, 2) the issues raised have not been authoritatively decided in this Circuit, and 3) the decisional process for this appeal, involving an interpretation of ERISA, would be significantly aided by oral argument. Appellant requests twenty minutes per side for oral argument.

## STATEMENT OF FACTS

### A.   The Trustee and the Leimkuehler Plan.

Robert Leimkuehler is the president of Leimkuehler Inc., a small company that manufactures prosthetic limbs and braces, and he serves as the Trustee of the company's 401(k) plan. JA 106-107. (Tr. 14: 9 through15:2; 19:21 – 25). Employees of Leimkuehler Inc. are the participants in the Leimkuehler Inc., Profit Sharing Plan. The Trustee first hired AUL to perform the day-to-day operations of this 401(k) plan in 2000. *See* JA 632 (Leimkuehler group annuity contract); JA 606 (contract amendment).

For a dozen years, AUL never disclosed to the Trustee a total fee amount that it charged the Plan for its services. JA 110 (Tr. 37:14-16). The primary reason AUL has never disclosed its total fees is because it does not disclose the amounts it takes in "revenue sharing" from the mutual funds in which the Plan's assets are invested.  JA 118 (Tr. 99:10-18; 111:5-8). AUL finally began providing limited disclosures on revenue sharing after the Trustee sued AUL. JA 245 (Tr. 206:22 through 207:13).

### B.   401(k) Plan Background.

A 401(k) plan is a "defined contribution" plan, which is a type of retirement plan that has individual accounts for each participating employee. JA 74. Employees (and some employers) make fixed contributions to their individual retirement savings accounts, and those tax-deferred savings are then invested in one or more investment vehicles made available through the plan. JA 76 (Complaint). Many employers, especially small employers, lack the time and expertise to set up and run a 401(k) plan, so they hire a provider like AUL for those services. AUL is a "full service" 401(k) retirement plan provider, and it offers complete plan management services, so "plan sponsors don't need to have all the answers, just our phone number to give to their participants." JA 74.

In order for a 401(k) plan to participate in AUL's platform of investment options, it must first enter into a "group annuity contract" with AUL, through which AUL makes investment options available. JA 239-40 (Tr. 77:25 − 78:6; 233:20-24); JA 204 (Tr. 32:6-20). The investment vehicles into which AUL's 401(k) plans ultimately invest are a relatively small group of mutual funds selected by AUL. JA 322; JA 327 (Tr. 100:6−8;140:25 − 141:1); JA 335-36 (Tr. 29:13 − 31:3; 32:14 − 33:1; 39:15−18; 40:14−18). As of August 2010, AUL's offering list consisted of 383 mutual funds.[1] JA 165, 172-80.

### C.  Mutual Funds and Mutual Fund Share Classes.

Mutual funds are the typical investment option offered in 401(k) plans. A mutual fund is an investment vehicle that pools the money of many investors. The fund is run by a professional investment manager who uses the pooled money to purchase securities, such as stocks and bonds, which make up the fund's investment portfolio. Interests in mutual funds are sold to investors in shares, each of which represents a proportional interest in the fund's assets.

The price of a mutual fund share, which is calculated and fixed once per day, is based on the value of the fund's assets (which fluctuates with the performance of its portfolio) and on the fund's annual fee, also known as the fund's "expense ratio." The expense ratio is the amount a mutual fund charges for its services, expressed as a percentage of the total assets the fund has under management. The largest component of an expense ratio is the investment management fee paid to the fund's manager for investment management services.

Many mutual funds offer different "classes" of shares to investors. JA 210-11 (Tr. 57:10 − 58:1; JA 204 (Tr. 30:9-23); JA 215. The primary difference among most share classes available to

---

[1] By contrast, according to the Investment Company Institute, in 2010 there were 7,581 mutual funds in the U.S., comprising 21,971 distinct mutual fund share classes available for investment. JA 150 (excerpt of 2011 Investment Company Fact Book (51st ed.); also available at http://www.ici.org/pdf /2011_factbook.pdf).

401(k) investors is the amount of the expense ratio (*i.e.*, annual fees). JA 326, 363 (Tr. 30:18 --

31:3; 222:16–20); JA 736 (¶ 13). The amount of that charge (*i.e.*, the percentage) varies from

share class to share class. JA 336 (Tr. 30:18 − 31:3); JA 136 (Tr. 76:15−20). For example, Growth

Fund of America has five share classes:  R-1, R-2, R-3, R-4 and R-5. JA 354 (Tr. 115:1−16). As a

result, two investors invested in the same mutual fund, but in different share classes of that fund,

will be invested in exactly the same portfolio of securities; the only difference will be the amount

they pay in mutual fund fees.

Even though the investment vehicles into which retirement contributions are ultimately

invested are mutual funds, the investment options AUL sells to its 401(k) plans are not mutual

funds themselves. The investment transaction is actually a two-step process. JA 206 (Tr. 39:1–17).

First, participants' contributions go into AUL's "separate account," where they are commingled

with the contributions of thousands of other participants. *Id.* (Tr. 40:7−25). Second, AUL uses

those assets to purchase mutual fund shares. *Id.* (Tr. 39:6 − 40:14). That two-step process occurs,

however, behind the scenes. From the perspective of plan participants, they invest their

retirement contributions directly in mutual funds:  "from a participant standpoint, an employee

standpoint, … [t]hey're just having money withheld, and we're taking that money and then

investing it with [a mutual fund like] Janus. But legally I suppose it's fully going through a

separate account." *Id.* (Tr. 39:18 − 40:6).

In reality, participants purchase an interest in an insurance company "separate account" that

AUL established for its 401(k) plans. A separate account is an insurance company account

established under state law in which the insurance company holds customers' assets "separately"

from the insurance company's own assets in its general account. In the same way a trustee holds

assets separately from his own assets for the benefit of a beneficiary, and those trust assets are

beyond the reach of the trustee's creditors, an insurance company holds assets in a separate

account, where they are beyond the reach of the insurance company's creditors. *See* 29 U.S.C. § 1002(17)[2] (defining "separate account").

AUL established and owns a single separate account for all its 401(k) plan clients. JA 617. *See also* JA 653 (§ 9.1 ("All amounts received or credited under this contract become the property of AUL.")); JA 628 (§ 9.16 ("We own all Mutual Fund or Portfolio shares held in an Investment Account.")). Within its 401(k) separate account, AUL has created sub-accounts (or "portfolios") known as "Investment Accounts." JA 617 (§ 1.16).

AUL operates its Investment Accounts like a mutual fund. It sells interests in its Investment Accounts in "Accumulation Units," each of which represents a proportional interest in the Investment Account's assets. JA 265 (Tr. 112:7-12); *see also* JA 635 (§ 1.2). As an Investment Account is akin to a mutual fund, so its Accumulation Units are akin to the shares of a mutual fund. Instead of investing in a diversified portfolio of securities, however, AUL invests each Investment Account into a single mutual fund. AUL typically names its Investment Accounts after the mutual it invests in. JA 630. For example, the "Alger American Growth" Investment Account invests in the mutual fund known as "Alger American Growth." *Id.* (investment table).

As with mutual fund shares, the price of the Accumulation Units of each Investment Account are fixed each day by AUL. JA 265 (Tr. 114:4–21). Like mutual fund managers, AUL also takes fees directly from the retirement assets in the separate account. JA 317 (Tr. 32:23 – 33:5). Accumulation Unit values are based on the value of the underlying mutual fund shares and the

---

[2] "The term 'separate account' means an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 29 U.S.C. § 1002(17).

fees that AUL assesses in the separate account, and they are computed using a formula AUL created. JA 397 (Tr. 42:15–24); JA 623-24 (§§ 5.3–5.4, generally describing formula).

Thus, when a participant makes contributions to his AUL 401(k) plan, instead of purchasing shares of mutual funds, he is actually purchasing Accumulation Units in AUL's Investment Accounts. JA 265 (Tr. 114:4-8); JA 238 (Tr. 71:9-22); JA 206 (Tr. 38:10-15). As AUL receives contributions from its 401(k) plans, AUL commingles them in its separate account, allocating each participant's individual contributions to the investment accounts they have selected. JA 252 (Tr. 33:3-19); JA 265 (Tr. 112:3-12); JA 209 (Tr. 50:24 – 51:1). AUL then invests the commingled contributions "allocated to any Investment Account ... in the share of the corresponding Mutual Fund." JA 617 (¶ 1.16); JA 206 (Tr. 39:6 – 40:14); JA 265 (Tr. 114:4-8); JA 238 (Tr. 71:13-22).

Thus, the two-step investment process mentioned above in fact consists of two distinct transactions. In the first step, plan participants' 401(k) contributions are used to purchase Accumulation Units in AUL's Investment Accounts. Second, AUL uses the pooled 401(k) contributions in each Investment Account to purchase mutual fund shares in its own name. JA 206 (Tr. 39:6 – 40:14).

### D.  AUL's Fee Practices and "Revenue Sharing."

AUL collects the fees for its 401(k) services by:  1) billing employers directly; 2) taking fees from the plan assets held in its Investment Accounts; and 3) taking "revenue sharing" from mutual funds. JA 269 (Tr. 22:23 – 23:24); JA 317 (Tr. 32:23 – 33:5).

Revenue sharing fees are payments the mutual funds make to AUL in return for AUL's inclusion of them in its 401(k) investment platform.[3] The payments are made pursuant to a revenue sharing agreement or, in AUL's corporate parlance, a "participation agreement." JA 347; JA 351 (Tr. 82:2–8, 103:22 – 104:10); *see also* JA 732 ("revenue sharing payments can provide an incentive for the 401(k) service provider to sell the shares of that mutual fund because they provide revenue to the service provider"). As one AUL witness put it:

> at the fund company level, they want assets. That's what an asset manager does, they want assets. So they are paying us to include them in a product suite that would allow them to gather assets.

JA 375 (Tr. 73:16–18). In other words, in exchange for revenue sharing payments, AUL provides the limited number of mutual funds it selects for inclusion in its investment platform with access to the plan assets of tens of thousands of plan participants to whom those mutual funds would not otherwise have access.

Under the terms of these agreements, the revenue sharing payment a mutual fund pays AUL is a portion of the fund's expense ratio. JA 347 (Tr. 85:5–11); JA 214. Share classes with higher expense ratios pay more revenue sharing to AUL than share classes with lower expense ratios. JA 736. *Cf.* JA 214 (excerpt of agreement) *with* JA 149 (expense ratios). In other words, the more expensive the share class, the more AUL receives in revenue sharing.

As an example, AUL's agreement with American Funds allows AUL to invest plan assets into five different share classes of the Growth Fund of America, but AUL only selects the R-3 or R-4 share classes, both of which pay revenue sharing. JA 215; JA 335-36 (Tr. 29:24 – 30:2, 30:18 – 31:3). AUL *never* uses the American Fund share classes that pay the least revenue sharing. JA 335-36; JA 355 (Tr. 29:21 – 30:6, 119:19–23).

---

[3] The one exception is Vanguard, which does not pay revenue sharing to 401(k) providers, but AUL nevertheless offers a few Vanguard fund investment options. JA 346 (Tr. 80:5-12).

Before 2007, AUL did not disclose to anyone — plan participants, trustees or even its own agents — any information about its revenue sharing practices; it did not even acknowledge the fact of the practice. JA 358-59 (Tr. 203:14 – 208:23). In fact, AUL actively concealed its revenue sharing practices as a conscious policy decision. In a January 2005 e-mail exchange, AUL's Vice President of Operations and Actuary, Retirement Services, Andy Wilkinson, expressed "significant reservations about disclosing revenue sharing."

> While I still have significant reservations about disclosing revenue sharing, I have less of a concern about a single case where the client insists. My issues are:
>
> 1) If we disclose it to one client, do we create issues for ourselves by not disclosing it all on a regular basis. ...
>
> 4) Actuarial put together the revenue sharing numbers for internal analysis and never intended for them to be the basis of an external disclosure.

JA 402-3. Wilkinson concluded, "I don't won't [*sic*] to lose this client over the disclosure of revenue sharing, could we just tell them what the average for their funds [*sic*] without disclosing the specific percentages?" *Id.* They decided to provide this "particularly difficult" client with a sanitized document, with "the revenue sharing column ... removed," and they would "use the explanation I provided during our call." *Id.*; *see also* JA 399 ("I won't send them the revenue attachment because even if I were to remove the revenue share column — the [sic] would still be able to figure out what we get.").

It was only after the Department of Labor began taking a closer look at 401(k) revenue sharing in 2007 that AUL made even a pretense of disclosing anything about revenue sharing. *See* JA 405 ("the winds of regulation change are blowing and full disclosure of sensitive data points including share class, ticker, revenue share, and expense ratios are already required or may be in the (near) future. As such disclosure becomes common place, Plan Sponsors, producers and participants are enabled to 'dig deeper' into the underlying mutual fund their subaccount

12

mimics."). In 2007, AUL created a revenue sharing "disclosure" that was supposedly available on an AUL website, but it was a website that was not accessible to plan sponsors, trustees or participants. JA 359–60 (Tr. 208:8–23, 211:17 – 212:3). Not until after this lawsuit was filed, in the last quarter of 2009, did AUL begin providing limited revenue sharing information, but even those disclosures were limited to *new* 401(k) clients. JA 245 (Tr. 206:22 – 207:13). AUL did not disclose its revenue sharing practices to the Trustee; he learned about the practice from a family member. JA 118 (Tr. 100:21–23).

### E.  AUL Unilaterally Selects Mutual Funds and their Share Classes.

In its group annuity contract, AUL reserves to itself authority and control over the Plan's investments, including the power:

- "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by any Investment Account";

- "to eliminate the shares of any of the eligible Mutual Funds, Portfolios, or other entities and to substitute shares of, or interests in, another Mutual Fund, Portfolio, or another investment vehicle, for shares already purchased … if further investment in any or all eligible Mutual Funds, Portfolios, or other entities becomes inappropriate in view of the purposes of the contract";

- "to eliminate or combine existing Investment Accounts if marketing, tax, or investment conditions warrant";

- "to transfer assets from any Investment Account to another separate account of AUL or Investment Account";

- "to provide other Investment Options under this contract at any time";

- "[i]n the event of any such substitution or change, ... [to make], by appropriate amendments, ... such changes in this contract as may be necessary or appropriate to reflect such substitution or change"; and

- to "combine one or more Investment Accounts and ... establish a committee, board, or other group to manage one or more aspects of the Investment Accounts."

JA 619-20. Consistent with those broad powers AUL reserves to itself, and as the district court expressly found, "AUL alone decides which share class that it will make available through the

13

investment account." SA 4. Significantly, and as the district court also found, AUL "does not specifically disclose to the Plan, or its participants, the different share classes available or the one that it has selected." *Id.*[4] AUL has never disclosed to its 401(k) plans the share classes into which AUL invested assets. JA 362 (Tr. 220:15 to 221:22); JA 383 (Tr. 54:18–24). *See also* JA 630; JA 661 (share classes omitted in investment table).

One of the screening factors AUL considers when deciding whether to include a fund in the investment platform is the amount of revenue sharing it will receive from the mutual fund. JA 335 (Tr. 28:1–6) ("We have a goal of what revenue sharing we want to receive from the investment companies. And that was part of the process."). "[B]ecause the share classes pay different revenue amounts, then that would be something we would look at, at that time." JA 335 (Tr. 29:1-4).

## SUMMARY OF ARGUMENT

The Trustee filed this lawsuit alleging that AUL violated its ERISA fiduciary obligations by investing the plan's assets in mutual funds that paid AUL compensation, known as "revenue sharing." The district court erred in concluding that AUL is not a fiduciary to the Leimkuehler Inc. 401(k) Profit Sharing Plan. Congress has imposed fiduciary obligations on anyone who "exercises any authority or control respecting management or disposition of ... [plan] assets." 29 U.S.C. § 1002(21)(A)(i). Unlike plan management or administration, which require "discretionary" authority or control, any exercise of authority or control over a plan's assets is sufficient to render a person an ERISA fiduciary.

Pursuant to the group annuity contract AUL entered into with the Trustee, AUL reserves for itself broad discretion in handling plan assets. AUL — and AUL alone — controls the plan assets

---

[4] *See also* JA 394 (Tr. 31:22 through 32:10); JA 129 (Tr. 82:21–22); JA 204 (Tr. 31:10–15); JA 244; JA 204 (Tr. 31:10–15); JA 262 (Tr. 43:3–15); JA 129 (Tr. 82:6–24).

in its separate account, and the separate account serves as the conduit through which AUL receives the plan's money and invests it into mutual funds. The district court erroneously concluded that AUL's control over the plan's assets in the separate accounts was insufficient to make AUL a fiduciary because "discretion" was required. The district court's interpretation is at odds with the plain language of the statute, and eight other Circuits have held to the contrary.

Even applying the district court's mistaken interpretation of section 1002(21)(A)(i) to require "discretionary" authority and control, AUL makes a critical decision for about the disposition of plan assets. "AUL alone decides which share class that it will make available through the [separate] account," and "[i]t does not specifically disclose to the Plan, or its participants, the different share classes available or the one that it has selected." SA4. AUL's decisions about share class allow AUL to determine — without the Trustee's approval — its own compensation for its services to the plan. AUL selects share classes that pay AUL revenue sharing, and those decisions demonstrate the discretion AUL exercises over the disposition of plan assets. Despite the factual findings about AUL's discretion, the district court erroneously concluded that AUL's share class selection did not make it a fiduciary under ERISA.

Finally, AUL asserted counterclaims against the Trustee, claiming ERISA provides for indemnification and contribution. AUL's counterclaims are premised on AUL being found to be a fiduciary to the Trustee's plan. The district court should have dismissed AUL's counterclaims because AUL is not entitled to invoke the limited right of indemnification. AUL provided no factual support for its counterclaims seeking indemnification and contribution under ERISA, and they should have been dismissed.

# ARGUMENT

## I.   STANDARD OF REVIEW

A district court's findings of fact on a motion for summary judgment are reviewed under the clearly erroneous standard. *Wilson v. DaimlerChrysler Corp.*, 236 F.3d 827, 829 (7th Cir. 2001). Rulings on motions for summary judgment are otherwise reviewed *de novo*. *Cohen v. City of Des Plaines*, 8 F.3d 484, 488 (7th Cir. 1993).

The standard of review for a ruling on a motion to dismiss a counterclaim is *de novo*. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

## II.   EVIDENCE OF AUL'S AUTHORITY AND CONTROL OF PLAN ASSETS PRECLUDED SUMMARY JUDGMENT ON FIDUCIARY STATUS.

The district court made two fundamental errors in reaching the conclusion that AUL is not a fiduciary of the Plan. First, the court's holding that ERISA's definition of "fiduciary" requires a finding of *discretionary* "authority or control respecting management or disposition of [plan] assets" was wrong. That holding is at odds with the plain language of the statute:  "*any* authority or control respecting management or disposition of [plan] assets" is sufficient. 29 U.S.C § 1002(21)(A)(i) (emphasis added). The court's holding also conflicts with the law in the eight other circuits to have addressed the question. The D.C., Second, Third, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits agree that because this clause in the statutory definition "contains no 'discretion' requirement," discretion "is irrelevant" to the fiduciary status analysis under this prong of the definition. *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006). "'[A]ny authority or control' is enough." *Id*. AUL exercises considerable authority and control over the management and disposition of the plan assets that AUL holds in its separate account, so the district court's conclusion that AUL is not a fiduciary of the Plan is clearly wrong.

Second, even applying the district court's erroneous interpretation of the statute, AUL is a fiduciary because it also exercises discretionary authority or control over the management or disposition of plan assets. The Trustee's evidence showed and the district court expressly found that "AUL alone decides which share class" of a mutual fund the Plan's assets will be invested in. SA 4. The main difference between the different share classes mutual funds make available to AUL for its 401(k) plans is the amount of the fees associated with each share class. AUL's share class selection is thus a decision about the fees to be charged against the assets being invested, and that, in turn, is a decision about the management of those assets and their disposition and investment returns. AUL's unilateral share class selections for the Plan therefore constitute not only an exercise of both authority *and* control over both management *and* disposition of the Plan's assets — it is an undeniably *discretionary* exercise of that authority and control. Accordingly, the district court's conclusion that AUL's selection of share classes does not make it a fiduciary is also clearly wrong, even applying the court's mistaken interpretation of the statute.

### A. The exercise of *any* authority or control over management or disposition of plan assets gives rise to fiduciary status.

"In every case charging breach of ERISA fiduciary duty, ... the threshold question is ... whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Nauman v. Abbott Laboratories*, 669 F.3d 854, 859 (7th Cir. 2012) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). "ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties — and to damages — under § 409(a)." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) (citation omitted).

At issue in this appeal is the meaning of ERISA's first definition of a "fiduciary with respect to a plan," which includes anyone who "exercises any discretionary authority or discretionary

control respecting management of such plan *or exercises any authority or control respecting management or disposition of its assets.*" 29 U.S.C § 1002(21)(A)(i) (emphasis added).

### 1. Rules of statutory construction foreclose the district court's holding that "any authority or control over management or disposition of [plan] assets" means "discretionary authority or control."

"Statutory interpretation begins with the plain language of the statute," and "[a]bsent clearly expressed Congressional intent to the contrary, the plain language should be conclusive." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). "A cardinal canon of statutory construction is that we 'must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *United States v. Rosenbohm*, 564 F.3d 820, 823 (7th Cir. 2009) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). Of particular relevance here "is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).

Thus, Congress' use of the word "discretionary" twice in section 1002(21)(A)(i) to modify "authority" and "control" of plan management, but its omission of that word to modify "authority" or "control" with respect to "management or disposition of its assets" must be presumed to be intentional. The difference is actually even more stark because instead of merely omitting the word "discretionary," Congress replaced it with the word "any." "[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5  (1997) (quoting Webster's Third New International Dictionary 97 (1976))). Congress' use of "any" to modify "authority or control" is most naturally read to mean authority

18

or control of whatever kind, and is not limited to discretionary authority or discretionary control. *See id*. at 220 ("Congress' use of 'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind.").

### 2. The district court's holding requiring discretionary authority or control conflicts with the law in eight circuits and with Department of Labor's interpretation.

All eight circuits that have addressed the question and the Department of Labor agree that section 1002(21)(A)(i) "imposes fiduciary duties only if one exercises *discretionary* authority or control over plan *management*, but imposes those duties *whenever* one deals with plan *assets*." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994); *accord Herman v. NationsBank Trust Co., (Georgia)*, 126 F.3d 1354, 1365 (11th Cir. 1997) ("The plain language of the definition clearly states that a person is not a fiduciary unless he either has discretion or exercises authority or control with respect to plan assets."); *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997); Brief of the Secretary of Labor as Amicus Curiae Supporting Appellants,[5] *McLemore v. Regions Bank*, No. 10-5480 (6th Cir. Nov. 19, 2010) ("§ 1002(21)(A), provides that '*any* authority or control' respecting the 'management or disposition of' plan assets is enough to confer fiduciary status on a person with respect to those assets," citing *Day* and *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)); *see also* Field Assistance Bulletin 2004–03 (Dep't of Labor Dec. 17, 2004) (discussing a "directed trustee's" "authority and control over plans assets" as basis of fiduciary status contrasted with that of a "discretionary trustee").

ERISA's plain language accounts for the unanimity of opinion that discretion is not an element of fiduciary status where plan assets are concerned. "[T]he word 'discretionary' is

---

[5] Available at http://www.dol.gov/sol/media/briefs/mclemore(A)-11-19-2010.htm. *See also* Brief of the Secretary of Labor as Amicus Curiae Supporting Plaintiff, *McLemore v. Regions Bank*, 2008 WL 5425491 (M.D. Tenn.) ("when third party administrators exercise the requisite authority under ERISA's functional test, they are fiduciaries regardless of whether their contracts limited their duties to ministerial duties").

conspicuously absent when the text refers to assets." *Board of Trustees of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assoc., Inc.*, 237 F.3d 270, 273 (3d Cir. 2001); *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005) ("Discretion is conspicuously omitted from the fiduciary function of controlling plan assets"); *Day*, 436 F.3d 234, 236 (D.C. Cir. 2006) ("the disposition clause contains no 'discretion' requirement").

There is also agreement about the necessity and logic of requiring discretion with respect to plan management but not with management or disposition of plan assets. "This distinction is not accidental — it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another." *FirsTier*, 16 F.3d at 911. "In Congress's judgment, and consistent with general trust law, parties controlling plan assets are *automatically* in a position of confidence by virtue of that control, and as such they are obligated to act accordingly." *Coldesina*, 407 F.3d at 1132.

> As a general matter, a relationship of trust is established when one acquires possession of another's property with the understanding that it is to be used for the owner's benefit, and in these circumstances an obligation arises on the part of the one in possession to act in the owner's bests interests rather than his own.

*Id.* at 1134 . Anyone who controls plan assets could use "the plan's money to pay his business expenses or go on vacation," and "this practical reality is precisely why control over assets is treated differently than control over management." *Id.* at 1133–34.

The district court decided it "need not and [would] not discuss" such "out-of-Circuit authorities" because it considered itself bound by contrary "relevant authority from the Seventh Circuit." SA 11–12. The view the court adopted is the same one advanced by the defendant in *Day*, that both clauses of section 1002(21)(A)(i) "require some element of *discretionary* 'authority or control.'" *Day*, 436 F.3d at 235–36. The D.C. Circuit "reject[ed] [that] interpretation of

§ 1002(21)(A)(i) because it does violence to the statutory text." *Id.* at 236. As discussed in the next section, this Court's decisions did not require the district court to adopt such an interpretation.

### 3. This Court's decisions did not compel the district court's holding that authority or control over management or disposition of plan assets must be discretionary.

Although a court is not free "to follow out-of-circuit precedent which conflicts with binding precedent from its own circuit," *Hart v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 360 F.3d 674, 680 (7th Cir. 2004), a district court should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [it] can." *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987); *Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir. 1986) ("district courts should give [such decisions] substantial weight"). In the present case, the district court misconstrued this Court's precedents, and as a result, failed to properly consider the decisions of other courts of appeal.

None of the cases on which the district court relied required it to conclude that fiduciary status under the section 1002(21)(A)(i) based on the assets clause requires *discretionary* authority or control over management or disposition of plan assets. For instance, in *Pohl v. National Benefits Cons., Inc.*, 956 F.2d 126, 129 (7th Cir. 1992), the Court held that the defendant was not a fiduciary because it lacked discretion. Although the Court did not quote or identify which part of the definition it was discussing, given that the defendant was a plan administrator, subsection (iii) seems likely because it requires "discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii). There is no mention of plan assets (the plan was a health insurance plan), and thus no indication that the Court considered a "control of plan assets" theory of fiduciary status. The primary issue on appeal was whether the plaintiffs' state law claims were preempted. This Court only addressed the fiduciary status issue because

"[t]he district judge remarked in passing that NBC is a fiduciary," but the plaintiffs had asserted no such claim. 956 F.2d at 128.

The district court's reading of *Pohl* is untenable. *Pohl's* statement that "ERISA makes the existence of discretion a sine qua non of fiduciary duty," *id.* at 129, does not purport to be an interpretation of the assets clause of section 1002(21)(A)(i). Nothing in the opinion suggests that clause was in play, and the word "assets" does not appear even once. It is inconceivable that this Court would have interpreted "any authority or control" of assets to mean "discretionary authority or control" of assets without at least discussing that specific language and offering *some* explanation.[6] It did neither because it was not construing any particular language of the statute. "[I]t is not appropriate to read oblique remarks as answering a question not squarely posed," especially when the "court has never grappled directly with the subject." *Loomis v. Exelon Corp.*, 658 F.3d 667, 674 (7th Cir. 2011).

Even if *Pohl* could somehow be understood to suggest that discretion is an essential element of the assets clause, those parts of the decision would be dicta because they were unnecessary to the decision and could be deleted without seriously impairing the analytical foundations of the holding. The case presented no occasion for the Court to decide whether authority or control over plan assets must be discretionary. Dictum is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding — that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (quoting *Sarnoff v. American*

---

[6] The district court took the same overly literal approach to similar statements in two other cases. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009); *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004). The court's reading of those cases was similarly misguided because neither of them involved an issue of fiduciary status that turned on whether the defendants had discretionary authority or control over plan assets; neither that legal issue nor the clause at issue in this case were discussed in any of the cases.

*Home Prod. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986)). "Dicta are the parts of an opinion that are not binding on a subsequent court." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). They are "the part[s] of an opinion that a later court, even if it is an inferior court, is free to reject." *Crawley*, 837 F.2d at 292. Contrary to the district court's opinion, this Court has not yet addressed the meaning of the assets clause of section 1002(21)(A)(i), and none of its decisions required the conclusion the district court reached, a conclusion that "does violence to the statutory text." *Day*, 436 F.3d at 236.

   **B.   The ability to move and transfer assets constitutes "authority or control over the management or disposition" of those assets.**

The act of transferring assets is "authority or control" over the "management or disposition" of plan assets. *Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994) (finding neither "management or disposition" of assets because "[n]one of the events ... transferred, sold, exchanged, or otherwise affected any asset of the plan"). Thus, for example, "[t]he right to write checks on plan funds is 'authority or control respecting management or disposition of its assets.'" *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). In *IT Corp.*, "General American was authorized 'to issue and accept checks drawn'" on a plan's bank account. *Id.* "This provision means that as a practical matter, a substantial amount of money would be under the control of General American, in the form of a bank account which it could deplete by writing checks." *Id.* "The words of the ERISA statute, and its purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries, require that a person with authority to direct payment of a plan's money be deemed a fiduciary." *Id.*; *see also LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (signatory who wrote checks on plan funds was a fiduciary).

Similarly, in *Coldesina*, one of the accountant defendants "received plan contribution funds from the plan, which he deposited into his business account, and then wrote checks on behalf of the plan." 407 F.3d at 1133. "This arrangement was initially set up to facilitate better recordkeeping; however, the practical reality is that [defendant] had total control over the plan's money while it was in his account." *Id.* The Tenth Circuit found those facts "even more compelling" than the facts in *IT Corp.* "because the account at issue belonged to the accountant defendants and not to the plan itself." *Id.* at 1134.

> [H]ere, where the plan was not affiliated with the account and had no authority to oversee its activities, it depended upon [defendant] to ensure the funds were handled properly. Indeed, to say that the accountant defendants did not control the money while it was in their account is to say that no one had control during that time.

*Id.*

In *Smith v. Provident Bank*, 170 F.3d 609 (6th Cir. 1999), a bank removed stock shares from a plan participant's account (after the shares had appreciated in value) and replaced them with cash in the amount the participant "had paid for the shares less dividends that he had received since the purchase date." *Id.* at 612. The court held that these acts constitute control of plan assets making the bank "liable under ERISA as a fiduciary." *Id.* at 613.

In *Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006), the third-party administrator of a plan, PHP:

> exercised control over assets in the Company's self-funded plan by allotting to itself an administrative fee and returning the remaining funds after its relationship with the Company terminated. On these facts, we hold that PHP exercised at least partial control over plan assets and, to the extent that it did so, qualifies as a fiduciary.

*Id.* at 494-95.

In *Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006), an insurance broker, Day, "accepted hundreds of thousands of dollars from twenty-nine ERISA-covered employee benefit plans for the purpose of purchasing insurance for the plans." *Id.* at 235.

Day undeniably had "authority or control" over the "disposition" of the plans' "assets." The plans sent to Day checks made payable to him. Day then deposited the plans' funds into his account. Day was obligated to "control" the "disposition" of those funds for paying the plans' insurance premiums. Instead, Day absconded with the funds. Because the disposition clause contains no "discretion" requirement, it is irrelevant whether Day exercised "discretion" in his thievery. "[A]ny authority or control" is enough.

*Id.* at 236.

### C. The evidence of AUL's authority and control of plan assets precluded entry of summary judgment for AUL.

It is undisputed that the Plan sends retirement contributions to AUL, and AUL deposits them in its separate account. AUL credits participants with accumulation units based on the amount of their contributions. AUL has physical control of the assets in its separate account and the power to transfer those assets. These constitute the exercise of authority or control over management or disposition of plan assets.

### 1. AUL exercises authority and control over the disposition of plan assets.

The funds that an employer sends to AUL are 401(k) retirement contributions, and they are unquestionably "plan assets" within the meaning of ERISA.[7] The insurance company separate account "via" which the Plan's "investments were made" is AUL's separate account,[8] an account which AUL established, owns, and controls exclusively. JA617 (§ 1.15). Third, the Plan's investments were made by AUL "via" AUL's separate account. In other words, AUL receives plan assets in an account over which AUL has exclusive control, and then AUL takes those plan assets out of AUL's account and invests them in mutual funds. "The 'management or disposition'

---

[7] 29 C.F.R. § 2510.3-102(a)(1) ("the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution").

[8] 29 C.F.R. § 2510.3-101(h)(1)(iii) (entitled "Definition of 'plan assets'— plan investments") ("when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity: … (iii) A separate account of an insurance company")

language in ERISA refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994).

That exercise of control over the disposition of plan assets makes AUL a fiduciary. Whether AUL exercises discretion when it invests the Plan's assets or, instead, invests the Plan's assets in mutual funds "in accordance with directions" from the Plan or its participants (as AUL maintains), is "irrelevant." *Day*, 436 F.3d at 236. "'[A]ny authority or control' is enough." *Id.*

The one common element of control found in each of the cases discussed above is the fiduciary-defendants' ability to transfer plan assets. In *IT Corp.*, *Coldesina* and *Day*, the defendants all had control because they had check writing privileges on plan assets. In *Smith*, the defendant could move stock shares and cash in and out of participants' accounts. In *Briscoe*, the defendant could take fees for itself directly from an account holding plan assets and could transfer plan assets to the employer. This case presents *all* of those same, dispositive elements of control over the disposition of plan assets.

- As in *Day*, where "plans sent to Day checks made payable to him," and *Coldesina*, where defendants "received plan contribution funds from the plan," here "[a]n employer collects payroll deductions from plan participants, adds any matching contributions, and then sends those funds to AUL." ECF 129 at 8.

- As in *Day* and *Coldesina*, where the defendants deposited plan assets in the defendants' own accounts, when AUL receives plan contributions, it puts them in AUL's separate account. ECF 129 at 7; JA394 (Tr. 32:11 to 33:25); JA 369; JA 372 (Tr. at 40:15 – 41:3; 50:24 to 51:1).

- As in *Day*, where "Day was obligated to 'control' the 'disposition' of those funds for paying the plans' insurance premiums," AUL is "obligated" to control the disposition of plan assets by investing them in mutual funds. JA 617 (§ 1.15 ("[a]mounts allocated to any Investment Account are invested in the share of the corresponding Mutual Fund")).

- As in *Smith*, where the bank could move shares of securities assets in an out of a participant's account, AUL allocates "accumulation units" to a participant's account.

ECF 129 at 7–8 ("a separate account works very much like a mutual fund" but "[r]ather than receiving shares of a mutual fund, participants receive 'accumulation units' in the separate account"); JA 623 (§ 5.2 ("We credit amounts allocated to an Investment Account in Accumulation Units.")).

- As in *Briscoe*, where the third-party administrator "allot[ed] to itself an administrative fee" out of plan assets, AUL allots to itself fees from the plan assets it holds in its separate accounts. JA 624; JA 649.

Just as General American's check writing privileges in *IT Corp.* meant "that as a practical matter, a substantial amount of money would be under the control of General American, in the form of a bank account which it could deplete by writing checks," 107 F.3d at 1421, AUL has a substantial amount of retirement money under its control in its separate account, which AUL could deplete by transferring funds from it. To paraphrase *Coldesina*:

> [H]ere, where the plan was not affiliated with the account and had no authority to oversee its activities, it depended upon [AUL] to ensure the funds were handled properly. Indeed, to say that [AUL] did not control the money while it was in [AUL's separate account] is to say that no one had control during that time.

407 F.3d at 1134.

AUL exercises the ultimate authority and control over the Plan's assets by claiming that it *owns* plan contributions: "All amounts received or credited under this contract become the property of AUL." JA 653 (§ 9.1). AUL also claims ownership of the plan assets purchased with plan contributions: "We own all Mutual Fund or Portfolio shares held in an Investment Account." JA 628 (§ 9.16).

The Trustee presented ample evidence that AUL exercises authority and control over the management and disposition of the Leimkuehler Plan's assets. The district court erred by failing to recognize that evidence was more than sufficient to preclude the entry of summary judgment for AUL on the issue of fiduciary status.

### 2. AUL exercises authority and control over the management and disposition of plan assets in AUL's separate account.

As described earlier in the Statement of Facts, in an AUL 401(k) plan, the investment of plan assets in mutual funds is a two-step process. First, participants buy "accumulation units" in AUL's Investment Accounts. Second, AUL takes that money and invests it in mutual funds. AUL exercises authority and control over the management and disposition during both steps of that process.

In the first step, when participants' initially invest in AUL's separate account, AUL takes possession of those plan assets. AUL then allocates those 401(k) contributions to its Investment Accounts. JA 623 (§ 5.2). Next, AUL "credit[s] amounts allocated to an Investment Account in Accumulation Units." *Id*. AUL determines the Accumulation Unit value for each Investment Account. JA 623 (§ 5.3 ).[9] AUL created the formula it uses for determining accumulation unit value. JA 623-24 (§§ 5.3–5.4 (generally describing formula)).

Thus, before plan assets ever leave AUL's separate account, AUL exerts considerable authority and control over their management and disposition. Moreover, AUL performs all these tasks of valuing and allocating plan assets internally — effectively, inside a black box and behind a curtain. Plan sponsors and trustees like Mr. Leimkuehler have no way of independently verifying either that AUL in fact uses the formula it says it uses or that AUL performs its calculations accurately. Even AUL's Director of Separate Accounts Administration could not

---

[9] "We establish the initial Accumulation Unit for a new Investment Account on the inception date of that Investment Account. The value of an Accumulation Unit for any later Valuation Period equals the value of an Accumulation Unit for the immediately preceding Valuation Period times the Net Investment Factor for the current Valuation Period. We determine the Accumulation Unit value before giving effect to any additions, withdrawals, or transfers in the current Valuation Period." JA 623 (§ 5.3). *See generally* JA 647-48 ("ARTICLE 5 – VALUATIONS").

explain the formula. JA 391; JA 397 (Tr. 12:1–2, 41:25 to 44:25). Plan sponsors and trustees simply have no other choice but to rely on AUL and *trust* it to do it right.

Thus, in just this very first step of the process alone, when AUL has exclusive possession of the Plan's assets, AUL assumes a position of trust in its "management and disposition" of plan assets in its separate account. Since plan trustees cannot oversee or double check AUL's handling of plan assets in the separate account, then there would be no fiduciary oversight of these critical valuation and allocation tasks, if AUL were not a fiduciary. But the valuations and allocations that AUL performs *is* "management and disposition" of plan assets, making AUL a fiduciary. These facts are undisputed and they precluded the entry of summary judgment for AUL.

In the second step of the process, and as AUL itself concedes, AUL transfers plan assets from its separate account to mutual funds and purchases mutual fund shares in its own name. That is the exercise of both authority and control over plan assets. Purchasing anything with plan assets is indistinguishable from writing a check on plan assets. Upon transfer, the mutual fund shares become assets of the plans for whose benefit AUL purchased them, and because AUL buy those assets in its own name, it has exclusive control over them. It holds the power to decide when and if to redeem those shares or continue holding them. Everything AUL does in the second step of the investment process are the epitome of authority and control over the management and disposition of plan assets. There is no credible argument to the contrary, and the district court erred in granting summary judgment the face of these facts.

## III. THE DISTRICT COURT'S FINDING THAT AUL SELECTS SHARE CLASS PRECLUDED SUMMARY JUDGMENT ON FIDUCIARY STATUS.

The Trustee presented evidence that AUL makes a critical investment decision for its 401(k) plans. AUL unilaterally decides which share classes of mutual funds it will invest plan assets in. JA 128 (Tr. 82:21–22); JA 367 (Tr. 31:10–15); JA 335; JA 358 (Tr. 28:24 to 29:4; 203:6–11). The

fact that AUL makes such significant investment decisions for the plans is hardly surprising, given that AUL reserved for itself the sweeping power to do just that — and much more — in its group annuity contract. AUL reserved the right:

- "to make additions to, deletions from, substitution for, or combinations of, the securities that are held by any Investment Account *or that any Investment Account may purchase*";

- "*to eliminate the shares* of any of the eligible Mutual Funds ... and *to substitute shares* of, or interests in, another Mutual Fund, *for shares already purchased* ... *if further investment* in any or all eligible Mutual Funds ... *becomes inappropriate* in view of the purposes of the contract";

- "to eliminate or combine existing Investment Accounts *if ... investment conditions warrant*";

- "to transfer assets from any Investment Account to another ... Investment Account"; and

- "to provide other Investment Options under this contract at any time."

JA 619-20 (emphases added).

In addition, the Trustee presented evidence that AUL does not disclose to plans which share classes it picks for them. When plan sponsors select which investment options to include in the their plans' menus, AUL never disclosed to them that there were multiple mutual fund share classes available.[10] Even after the fact, AUL never disclosed to plans which share classes AUL invested their assets in. JA 362 (Tr. 220:15 to 221:22); JA 383 (Tr. 54:18–24).

AUL's Assistant Vice President of Products and Investments, Terry Burns, testified that AUL does not disclose to plans which share classes AUL selects for them.

Q. Does AUL ever disclose which share class, to a plan sponsor or plan trustee, that his separate account investments will be invested in?

A. I don't know of any particular location where that's found.

---

[10] JA 394 (Tr. 31:22 through 32:10); JA 129 (Tr. 82:21–22); JA 204 (Tr. 31:10–15); JA 244; JA 204 (Tr. 31:10–15); JA 262 (Tr. 43:3–15); JA 129 (Tr. 82:6–24). *See also* JA 630; JA 661 (share classes omitted in table of investment accounts).

JA 362 (Tr. 221:17–22) (objection omitted). In fact, AUL has never disclosed to the Trustee which mutual fund share classes it has invested the Leimkuehler Plan's assets since AUL became the Plan's 401(k) provider in 2000.

The Trustee's evidence was sufficient to preclude summary judgment for AUL. Even the district court made an express factual finding that "AUL alone decides which share class" a plan will be invested in. SA 4. *See also* JA 367 (Tr. 31:10–15); JA 335; JA 358 (Tr. 28:24 to 29:4, 203:6–11). The court also found that AUL "does not specifically disclose to the Plan, or its participants, the different share classes available or the one that it has selected." SA 4. Despite those findings, the district court apparently failed to appreciate the completely dispositive significance of them. Those findings of fact are critical for three distinct reasons.

First of all, those findings mean that AUL meets the ERISA definition of a fiduciary, even applying the district court's mistaken interpretation of section 1002(21)(A)(i) to require "discretionary" authority and control. If "AUL alone decides which share class," then AUL *does* exercise discretion, contrary to the district court's ruling. The finding that "AUL alone decides which share class" the Plan will invest in is a finding that AUL makes its own, independent judgment among the available share classes. That is a discretionary act, and it is one that also necessarily means that "AUL alone decides" how much the Plan will pay in mutual fund fees, since the only difference in share classes are the fees associated with them. That is discretion by any measure.

Moreover, those factual findings lead inescapably to the legal conclusion that AUL was exercising "authority or control" over both "management" *and* "disposition" of plan assets within the meaning of ERISA. Deciding which share class assets will be invested in is "management" of those assets and is the final "disposition" of them before the mutual fund investment manager takes over. "The 'management or disposition' language in ERISA refers to the common

31

transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Johnson v. Georgia-Pac. Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994).

Finally, when AUL selects a share class for the Plan, it is also deciding *how much AUL will receive* in revenue sharing payments. For example, one of AUL's revenue sharing agreements with American Funds made five retirement share classes available to AUL. The R-5 share class was the least expensive at 39 basis points (0.39%), and would have paid zero revenue sharing to AUL. The R-1 share class was the most expensive at 144 basis points (1.44%), of which 100 basis points would have gone to AUL in revenue sharing. An AUL witness testified in 2011 that AUL's then-current practice was to use only the R-3 or R-4 share classes. JA 335-36  (Tr. 29:24 to 30:6). The R-3 shares cost 97 basis points, and paid AUL 50 basis points, and the R-4 shares cost 68 basis points and paid AUL 25 basis points. Even if every one of AUL's selections of either the R-3 or R-4 share classes was reasonable and beyond reproach, they would still constitute judgment calls about the management or disposition of the assets that were invested in those share classes. That is a fiduciary function.

The district court concluded that "existing Seventh Circuit law" forecloses a finding that AUL was a fiduciary by virtue of its unilateral selection of mutual fund share classes, although the court did not cite any specific cases for that proposition. This Court's decision in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), suggests exactly the opposite. In *Hecker*, the plaintiffs "argue[d] that Fidelity Trust exercised the necessary control to confer fiduciary status by its act of limiting Deere's selection of funds through the Trust Agreement to those managed by Fidelity Research." *Id.* at 583. This Court disagreed only with the factual premise of that argument, that Fidelity limited the fund selection. "[T]he Trust Agreement [gave] Deere, not Fidelity Trust, the final say on which investment options [would] be included. The fact that Deere may have discussed this decision, or negotiated about it, with Fidelity Trust does not mean that Fidelity Trust had

discretion to select the funds for the Plans." *Id*. Thus, in contrast with the present case, Deere was not stuck with the investment options proposed by Fidelity. The Leimkuehler Plan and the Trustee *are* stuck with AUL's share class selections.

AUL did not merely "propose" a share class for a plan's consideration. To the contrary, "AUL alone" chose share classes, and it did not disclose its selections, *even after it purchased the shares*. AUL thus had the "final say" — indeed, the *only* say — about which share class a plan would invest in. The Trustee had no option to choose a different share class. AUL's share class selections for the Plan were final and subject to change only by AUL.

The district court's apparent belief that the timing of AUL's share class selections somehow mattered is also wrong. The court wrote:

> when a provider offers plan sponsors a pre-selected universe of mutual funds of pre-selected share classes that plan sponsors can choose to include in their plans or not, the provider is not exercising "authority or control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A)(i). Providers do, however, exercise such authority and control when they unilaterally change the investment choices that participants have already made.

SA 15. The fact that AUL may secretly know which share class it intends to purchase, even before a plan and its participants select investment options, does not change the analysis. Indeed, since AUL does not place a purchase order with a mutual fund for any particular share class until well after a plan and its participants have made their investment choices, it does not make its actual share class selection until it places the buy order for a particular share class.

The district court rejected the Trustee's arguments, but it did not fairly address them. The court simply dismissed them because the Trustee had not cited authority holding "that when 401(k) plan providers like AUL choose among share classes for inclusion in their pre-selected menu of options for plan sponsors, the providers are exercising authority and control for the

purposes of 29 U.S.C. § 1002(21)(A)(i)."[11] SA 15. Without any other analysis, "the Court agree[d] with AUL, that if a provider can limit the mutual funds it will offer to plan sponsors, it can likewise select to only deal with particular share classes." SA 15. In a third and final sentence on this point, the court wrote:

> In summary, under existing Seventh Circuit law, when a provider offers plan sponsors a pre-selected universe of mutual funds of pre-selected share classes that plan sponsors can choose to include in their plans or not, the provider is not exercising "authority or control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A)(i).

SA 15.

The district court failed to explain how AUL could have "alone decide[d] which share class that it [would] make available," not have disclosed "the one that it has selected," and yet still not have "exercise[d] any authority or control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A)(i). The court's factual findings do not support its legal conclusion. AUL's unilateral selection of share class is a fiduciary function, and the district court's ruling to the contrary should be reversed.

## IV. THE DISTRICT COURT ERRED IN REFUSING TO DISMISS ALL OF AUL'S "CONTINGENT" COUNTERCLAIMS.

In its amended answer, AUL attempted to assert five counterclaims, four of which were for indemnity or contribution. AUL purports to bring the fifth counterclaim as a fiduciary on behalf of the Plan, alleging that the Trustee breached his fiduciary duties to the Plan by not stopping AUL from breaching its fiduciary duties to the Plan. *See* JA 101-02.

All of AUL's counterclaims were based on the premise that if AUL were found liable to the Plan and required to disgorge fees it took in violation of ERISA, then the Trustee should also

---

[11] Until the district court ruled, the issue was one of first impression. No court had discussed the share class selection issue in any reported decision, at least insofar as the Trustee's counsel is aware. There simply was no available authority of the sort the court faulted the Trustee for failing to cite.

have to pay something either to AUL or the Plan. AUL's only allegation of wrongdoing by the Trustee is that he breached his duties to the Plan by failing "to ensure that AUL did not breach any fiduciary duty it allegedly had" and that "he failed to prevent AUL from committing a breach." JA 97-98 (¶¶ 20, 22, 26, 29, 33). So the gist of AUL's counterclaims is that the Trustee, not AUL, ought to make the Plan whole for fees AUL took in violation of ERISA, or at the very least that the Trustee be required to chip in on the disgorgement.

AUL's counterclaims fail to state any claim for relief. To begin with, there is a threshold question about whether there is any longer a right of contribution or indemnity under ERISA at all. Even if there are still such remedies, there is no basis for making those remedies available to AUL in the present circumstances. In circumstances like these, if the Trustee were held liable by Plan participants for the losses AUL caused to the Plan, longstanding, black-letter principles of trust law would entitle *the Trustee* to indemnity *from AUL*, not the other way around.

All of AUL's counterclaims depend on the Trustee first prevailing on one of the claims against AUL for disgorgement of its ill-gotten fees. That would necessarily entail a finding that AUL is a fiduciary of the Plan and that by taking the fees in question, AUL breached its fiduciary duties to the Plan, engaged in a prohibited transaction, or both. If that occurs, then AUL's fifth counterclaim for breach of fiduciary duty, purportedly brought on behalf of the Plan, will necessarily vanish. At that point, the Plan will have been made whole through its recovery from AUL, and neither the Plan nor its participants would have any additional claim for recovery against the Trustee. The explicit condition precedent to AUL's theory of recovery is also its fatal flaw, as a matter of logic and law. For these reasons and more, AUL's claims are facially implausible and ought to be dismissed.

### A. The district court erred in refusing to dismiss all of AUL's counterclaims for indemnity and contribution.

The Supreme Court has "been especially 'reluctant to tamper with [the] enforcement scheme' embodied in [ERISA] by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)). "[W]e have noted that ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.* (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quoting *Russell*, 473 U.S. at 146-147)) (internal quotation marks omitted). Thus, the threshold issue is whether there is any contribution and indemnity claim under ERISA that AUL may assert. Even if there is, it is at least clear that there is no broad, general right of contribution or indemnity of the sort AUL attempts to assert.

### 1. Courts have held that there is no contribution or indemnity remedy under ERISA, including in a revenue sharing case like the present one.

Despite AUL's labeling of its first and second counts as "contribution under ERISA" and "indemnity under ERISA," ERISA does not specifically authorize contribution and indemnity remedies. As a result, courts are split on whether those remedies are available. *BP Corp. N. Am., Inc. v. Northern Trust Invs., N.A.*, 692 F. Supp. 2d 980, 982-84 (N.D. Ill. 2010) (discussing and collecting cases). *See Travelers Cas. and Sur. Co. of Am. v. IADA Servs., Inc.*, 497 F.3d 862, 866 (8th Cir. 2007) (no right of contribution under ERISA); *Kim v. Fujikawa*, 871 F.2d 1427 (9th Cir. 1989) (same). *But see Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 15–18 (2d Cir. 1991) (recognizing contribution and indemnity claims among ERISA fiduciaries).

In 1985, this Court recognized a right of indemnity between ERISA fiduciaries "in narrowly appropriate circumstances." *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984). Because *Free* was decided before the Supreme Court's decisions in *Mertens*, *Russell* and *Knudson*, and this Court "has

not returned to the question of whether ERISA contains an implied right of indemnification," district courts in the circuit have come down both ways on the issue. *BP Corp.*, 692 F. Supp. 2d at 983. Similarly, this Court has noted that "whether ERISA defendants have such a right" of contribution "remains an open [question] in this circuit." *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 413 (7th Cir. 2006).

In a recent revenue sharing case against John Hancock Life Insurance Company, a court rejected Hancock's claims for contribution or indemnification. "The lack of any explicit reference to contribution or indemnification in the text of ERISA belies the assertion that holding all co-fiduciaries accountable was of central concern to the drafters of the statute." *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 195 (D. Mass. 2008). "Because this Court finds that ERISA does not allow for an implied right of contribution or indemnification, Hancock's counterclaims will be dismissed." *Id.*

Whether this Court reaches the question of whether some limited form of contribution or indemnity still exists under *Free*, it is clear there is no broad, open-ended right of contribution or indemnity. Moreover, even if some limited forms of the remedies still exist, it is clear that AUL cannot invoke them here, as discussed next.

### 2. AUL is not entitled to indemnity because *Free* recognized only a limited right to indemnification where a *passive* trustee seeks indemnification from a more culpable *active* trustee.

In *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984), this Court held that ERISA permitted an indemnity claim where "a co-trustee who ha[d] not availed himself of the protection of section 1105, and ha[d] therefore been required to make good a loss to a plan, can nonetheless recoup his loss from his more culpable co-trustee. We believe that ERISA allows such an action in narrowly appropriate circumstances." *Id.* at 1337 (recognizing a right "of indemnification within the limited circumstances of this case"). "*Free* made clear that it found an implied right to

indemnification where a passive trustee seeks indemnification from a more culpable active

trustee." *BP Corp. N. Am., Inc. v. Northern Trust Invs., N.A.*, 692 F. Supp. 2d 980, 985 (N.D. Ill. 2010).

The district court, however, "underst[ood] *Free* to hold that ERISA permits contribution or

indemnity between co-fiduciaries, subject to general equitable principles," SA 33, even though

this Court held that "ERISA allows such an action in narrowly appropriate circumstances" and

"within the limited circumstances of this case." *Free*, 732 F.2d at 1337.

Even so, under the law of trusts, when two fiduciaries breach their duties, but only one profits

from their breaches, the fiduciary who profited has no claim for indemnification or contribution

against the fiduciary who did not profit from the breaches. *See* RESTATEMENT (SECOND) OF

TRUSTS § 258. To the contrary, it is the fiduciary who did not profit who may sue the fiduciary

who did profit for indemnity.

> (1) Except as stated in Subsection (2), where two trustees are liable to the beneficiary for
> a breach of trust, each of them is entitled to contribution from the other, except that
>
>> (a) *if one of them is substantially more at fault than the other*, he is not entitled to contribution
>> from the other but the other is entitled to indemnity from him; or
>>
>> (b) *if one of them receives a benefit from the breach of trust*, the other is entitled to indemnity
>> from him to the extent of the benefit; and for any further liability, if neither is more
>> at fault than the other, each is entitled to contribution.
>
> (2) A trustee who commits a breach of trust in bad faith is not entitled to contribution or
> indemnity from his co-trustee.

Restatement (Second) of Trusts § 258.

AUL alleged no facts stating a plausible claim for indemnity or contribution under *Free* or

otherwise, a standard the district court erroneously failed to require AUL to meet. Although, like

a complaint, a "counterclaim need not contain detailed factual allegations, it must include

enough facts to state 'a plausible claim for relief.'" *United States v. Jallali*, No. 11-11737, 2012 WL

1579326 (11th Cir. May 7, 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *accord E.I. du*

*Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Even viewed in the most favorable light, at most AUL claims that it and the Trustee are fiduciaries of the Plan and that they agreed the Plan would pay AUL compensation to which it was not entitled. Those allegations hardly amount to a claim that AUL is a "passive" fiduciary entitled to indemnity under *Free*.

While in many situations it may not be possible at the pleading stage to determine relative culpability from the pleadings, here it is. AUL does not dispute that it knowingly and intentionally took the fees in question. To the contrary, AUL vigorously defends the propriety of taking the fees, even in its counterclaims. Moreover, AUL makes no allegation that the Trustee knew AUL was taking the fees. Thus, if AUL's receipt of those fees constituted a breach of fiduciary duty or prohibited transaction — which is the explicit condition precedent to all of AUL's counterclaims — then it is beyond any rational dispute that AUL was also "substantially more at fault" than the Trustee. AUL is therefore not entitled to contribution from the Trustee.

Likewise, AUL is the only fiduciary who profited from its breaches of fiduciary duty and prohibited transactions. AUL has made no allegation, much less any *plausible* allegation, that *the Trustee* profited from AUL's ERISA violations. AUL does allege that "if AUL had not received revenue sharing from the mutual fund companies, then it would have had to charge more in direct fees to *the Plan or its participants*," and that the Trustee "willingly accepted the benefits of AUL's services." JA 96-97 (¶¶ 15-16). Thus, at most AUL has alleged that the Plan or its participants profited from AUL's ERISA violations, not that the Trustee profited. AUL has thus failed to allege that the Trustee benefited from AUL's breaches, breaches from which AUL

clearly did profit through its receipt of the fees in question. As the only fiduciary who profited

from AUL's breaches, AUL is not entitled to indemnification from the Trustee.

Finally, AUL knowingly and intentionally negotiated and took the revenue sharing fees.

Because a fiduciary "who commits a breach of trust in bad faith is not entitled to contribution or

indemnity from his co-trustee," AUL is not entitled to contribution or indemnity here. AUL's

counterclaims for contribution and indemnity "under ERISA" should have been dismissed.

### B. AUL failed to state a counterclaim on behalf of the Plan for the Trustee's alleged breach of fiduciary duty.

"Like claims under §§ 1109(a) and 1132(a)(3), indemnification claims under ERISA[12] may

go forward *only if the plan has suffered a loss.*" *Sharp Elecs. Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d

505, 513 (7th Cir. 2009) (citing 29 U.S.C. § 1105(a) and *Alton Mem'l Hosp. v. Metropolitan Life Ins.

Co.*, 656 F.2d 245, 249-50 (7th Cir.1981)) (emphasis added).

> To survive MetLife's motion to dismiss, Sharp had to include allegations that supported
> (1) its right of action under ERISA (that is, that Sharp was acting either as a plan
> fiduciary, beneficiary, or participant); (2) MetLife's status as a plan fiduciary;
> (3) MetLife's breach of its fiduciary duties; and (4) a cognizable loss to the plan flowing
> from that breach. Sharp's complaint falls short. Its amended cross-complaint offers only
> the conclusory statements that MetLife is a fiduciary, that Sharp is a plan fiduciary, that
> MetLife breached its fiduciary duties to Sharp, that Sharp has suffered damage from
> that breach, and that MetLife must reimburse the Plan for its losses.

*Sharp*, 578 F.3d at 512 (citations omitted). In the present case, AUL's counterclaim "falls short"

for the same reason Sharp's did, and for one additional reason. Like Sharp, AUL has failed to

allege any facts supporting the conclusion that the Plan will suffer any cognizable loss if AUL is

held liable for its ERISA violations. In addition, AUL failed to allege any facts supporting the

conclusion that the Trustee violated his fiduciary duties to the Plan.

---

[12] Although this language may seem to suggest that this Court still recognizes an ERISA claim for indemnification among plan fiduciaries, that issue was not before the court and was not decided. To the contrary, for reasons aside from whether such a right exists, the court held the counterclaimant had failed to allege sufficient facts stating such a claim.

**1. AUL failed to allege any cognizable loss to the Plan.**

The only conceivable loss to the Plan, according to AUL's allegations (or for that matter, according to the Trustee's allegations) is the loss AUL caused the Plan to sustain by AUL's violations of ERISA. The explicit condition precedent underlying all of AUL's counterclaims, however, is the Trustee's success in recovering AUL's ill-gotten fees. If AUL is liable on any of the Trustee's claims, then AUL must "make good to [the] plan any losses to the plan resulting from each such breach, and to restore to such plan any profits … which have been made through use of assets of the plan." 29 U.S.C. § 1109(a). Accordingly, if the Trustee recovers those fees from AUL, the Plan will have been made whole and will have no cognizable loss for which AUL could recover from the Trustee. AUL's fifth counterclaim, therefore, is a self-defeating, fatally flawed claim. The district court erred in failing to dismiss it.

**2. AUL alleges no facts supporting its "unadorned" and conclusory allegation that the Trustee breached his fiduciary duties to the Plan.**

AUL's breach of fiduciary duty claim also fails because AUL failed to allege any facts supporting its conclusory allegation that the Trustee breached his fiduciary duties to the Plan or caused damage to the Plan. JA 96-102 (¶¶ 21, 28 ("the resulting harm (if any) to the Plan and its participants was also the fault of Leimkuehler, who breached his fiduciary responsibility to manage and control the assets of the Plan"); ¶¶ 22, 29, 48 ("then Leimkuehler will have breached his own fiduciary duties under ERISA because he failed to prevent AUL from committing a breach"); ¶¶ 27, 39 ("Any damages to the Plan or its participants were caused by Leimkuehler's conduct and not AUL's conduct"); ¶¶ 35, 41, 47 ("the resulting harm (if any) to the Plan and its participants was also the fault of Leimkuehler, who breached his fiduciary responsibility to manage and control the assets of the Plan by failing to conduct himself with the care, skill,

41

prudence, and diligence under the circumstances that a prudent ERISA fiduciary would use in operating and administering the Plan")).

AUL failed to allege any specific act of the Trustee that states a plausible claim that he breached his fiduciary duties to the Plan. The *only* fact AUL alleged, an omission, is that the Trustee "failed to prevent AUL from committing a breach," but AUL made no allegation that would have supported an inference that the Trustee knew about AUL's breach or that he failed to "make[] reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a)(3). Because section 1105(a)(3) would impose co-fiduciary liability on the Trustee only if he had knowingly turned a blind eye to AUL's ERISA violations, and because AUL makes no allegations that the Trustee did so at any time prior to "mak[ing] reasonable efforts to remedy the breach" — that is, at any time prior to filing this lawsuit — AUL failed to state a claim of breach of fiduciary duty by the Trustee to the Plan.

In a very similar case, *Haddock v. Nationwide Fin. Servs., Inc.*, 272 F.R.D. 61 (D. Conn. 2010), the court explained why counterclaims like AUL's must fail:  they are self-defeating attempts by insurance companies to foist their liability for revenue sharing on unsuspecting plan fiduciaries. Such claims are contingent on a factual finding that a plan's fiduciaries did not approve the revenue sharing payments, and that the defendant is liable. *Id*. at 268. "That is fatal to Nationwide's counterclaim." *Id*.

> No rational trier of fact could find the Trustees wholly responsible for the Plans' losses after first finding that Nationwide is liable to the Plans for its breach; the two propositions—that Nationwide is responsible and must disgorge its net profits, and that the Trustees are entirely responsible and must compensate the Plans for their losses— are mutually exclusive. Nationwide's construction of its counterclaim to be contingent on a finding of liability to the Plans undermines its theory that the Trustees are somehow exclusively responsible for losses stemming from the revenue sharing payments.

*Id.* That same rationale is fully applicable here. The district court erred in failing to dismiss AUL's counterclaim for breach of fiduciary duty. This Court should reverse.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's judgment and remand the case with instructions for the court to dismiss AUL's counterclaims and for further proceedings.

Respectfully submitted,

*/s/ Klint Bruno*

Klint L. Bruno
Korein Tillery LLC
205 N. Michigan Avenue, Suite 1940
Chicago, Illinois 60601
Direct: (312) 899-5065
Fax: (312) 641-9555

Robert L. King
Korein Tillery LLC
505 N. 7th Street, Suite 3600
St. Louis, Missouri 63101
Phone:  (314) 241-4046
Fax:  (314) 241-3525

Kathleen A. DeLaney
DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, Indiana  46205
Phone: (317) 920-0400

Eric H. Zagrans
Zagrans Law Firm LLC
24500 Chagrin Boulevard, Suite 200
Cleveland, Ohio 44122
Phone: (216) 771-1000

*Attorneys for Appellant Robert Leimkuehler*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a) REQUIREMENTS**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,906, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using  Microsoft Word for Mac 2011, version 14.1.4  in   12 point (text) and 11 point (footnotes) Baskerville font   .


 */s/ Klint Bruno*
Attorney for Plaintiff Robert Leimkuehler

Dated: May 31, 2012

## CIRCUIT RULE 30(d) STATEMENT

All of the materials required by Circuit Rule 30(a) and (b) are included in the Joint Appendix filed with Appellant's opening brief.

*/s/ Klint Bruno*
Attorney for Appellant Robert Leimkuehler

Dated: May 31, 2012

**ATTACHED REQUIRED SHORT APPENDIX**

## SHORT APPENDIX TABLE OF CONTENTS

Order granting Defendant's motion for summary judgment (ECF 165).....................................SA1

Order re: Plaintiff/Counter-defendant Robert Leimkuehler's Motion to Dismiss
Defendant/Counter-plaintiff AUL's Counterclaims (ECF 75)..................................................SA27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT V. LEIMKUEHLER, as trustee and on behalf of Leimkuehler, Inc., Profit Sharing Plan,<br>　　　*Plaintiff*,<br><br>　　vs.<br><br>AMERICAN UNITED LIFE INSURANCE COMPANY,<br>　　　*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>1:10-cv-0333-JMS-TAB |

## ORDER

Presently before the Co urt in th is action alleging breach es of fiduciary duty under the

Employee Retirem ent Security Act ("ERISA "), 29 U.S.C. §§ 1001  *et seq.* , is the Defendant

American United Life Insurance C ompany's ("AUL ") m otion for summary judgm ent. [Dkt .

127.]

### I.
#### STANDARD OF REVIEW

A motion for summary judgment asks that th e Court find that a tr ial based on the uncon-

troverted and admissible evidence is unnecessary because, as a matter of law, it would conclude

in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judg-

ment, the non-moving party m ust set forth specific , admissible evidence s howing that there is a

material issue for trial. Fed. R. Civ. Pro. 56(e);  *Celotex Corp. v. Catrett* , 477 U.S. 317, 323

(1986).

As the current version R ule 56 m akes clear, wh ether a party asserts th at a fact is und is-

puted or genuinely disputed, the party m ust support the asserted fact by citing to particular parts

of the record, including depositions, docum ents, or affidavits.  Fed. R.  Civ. Pro. 56(c)(1)(A).  A

party can also support a fact by showing that the  materials cited do not es tablish the absence or

- 1 -

presence of a genuine dispute or  that the adverse party cannot  produce adm issible evidence to support the fact.  Fed. R. Civ. Pro.  56(c)(1)(B).  Affidavits or decl arations must be made on personal knowledge, set out facts that w ould be admissible in evidence, and show  that the affiant is competent to testify on matters stated.  Fed. R.  Civ. Pro. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals ha s "repeatedly assured the district  cou rts th at they are no t required to scour every inch of th e record for evidence that is  potentially relevant to the summ ary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conc lusory statem ents backed by inad missible evidence is insufficient to create an issue of material fact on summary judgment.  *Id*. at 901.

The key inquiry is whether adm issible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact.  *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).  When conducting this inqu iry, the Court m ust give the non-m oving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party."  *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

Consistent with the ap plicable standard of review, the facts that follo w are presented in the light most f avorable to Pl aintiff Robert V. Leim  kuehler, who is  the tru stee of th e

- 2 -

SA2

Leimkuehler, Inc., Profit Sharing Plan (the "Plan").  Unless otherwise stated, all factual disputes are resolved in favor of Mr. Leimkuehler.[1]

### A.  The Plan's Investments in AUL's Separate Account

In 2000, the Plan entered into a group variable   annuity contract with A UL.  [Dkt. 128-11.]  Through it, AUL agreed to permit Plan participants to invest their assets "in" certain mutual funds through a "separate accoun t" maintained with AUL, and to perform certain recordkeep ing and other administrative services for the Plan.  [*See id.* § 1.15; dkt. 128-1 ¶3.]

The separate account is an account for tradi  ng mutual funds that is, for regulatory rea-sons, separate from AUL's other assets—hence the name "separate account."  [*See* dkt. 134-3 at 7.][2]  AUL di vided the separate acco unt into sub -accounts th at correspon d to the m utual funds that AUL offered to the Plan.  [ *Id.*]  For exam ple, the "Alger Am erican Growth" investment ac-count invests only in the "Alger A merican Growth" mutual fund.  [Dkt. 128-11 at 17.]  AUL's investment accounts are then uniti zed into "accumulati on units," which corre spond to the value of shares in the m utual fund and which AUL a ssigns to participants—from  this Plan and oth-ers—who invest in the partic ular investment account.  [ *Id.* at 22; dkt. 134-5 at  11.]  Thus, rather than buying "shares" in a m utual fund, participants buy investment units in an account in AUL' s name, which in turn buys the shares in the f und, as disclosed in the gr oup variable annuity con-

---

[1] Very few facts  are actu ally in dispute, and no  material ones.  Indeed,  Mr. Leimkuehler argues that but for his pending class-ce rtification motion, he would have  filed a cross-m otion for sum-mary judgment on the issue of AUL's fiduciary st atus.  [Dkt. 136 at 23 n.11.]  At oral argum ent, the parties agreed that the Court could and s hould resolve the motion for summary judgment be-fore turning to the motion for class certification.  [Dkt. 163 at 96, 111.]

[2] Insurance is a highly- regulated industry, for the benefit of policyholders.  State law  explicitly contemplates allowing insurance companies to provi de variable annuities,  lik e the one at issue here, via a s eparate account—which are "not charg eable with liabilities arising ou t of any other business the [insurance] company may conduct...which has no specific relation to or dependence upon such account."  Ind. Code § 27-1-5-1 Class 1(c).  ERISA itself also contemplates the use of separate accounts.  *See* 29 C.F.R. § 2510.3-101(h)(1)(iii).

SA3

tract and its marketing materials.  [*See* dkt. 128-11 134-3 at 7.]  AUL c alculates the daily values
of the accumulation un its on the basis of a cont ractually disclosed formula, which accounts for
expenses associated with the mutual funds.  [Dkt. 128-11 at §§ 5.3-5.4.]

### B.  AUL's Selection of Share Classes

A mutual fund sells several cl asses of shares, which diffe r by the fees and expenses—
termed "expense ratio"—that the mutual fund w ill charge against the fund's assets.  [*See* dkt. 89
at 8; 134-3 at 11.]  Although Plan participants control which mutual fund they want to "buy," via
the separate-account procedure described above, [ *see* dkt. 128-3 ¶5], AUL alone decides which
share class that it will make available through th e investment account, [dkt. 135-1 at 8].  It does
not specifically disclose to the Plan, or its participants, the different share classes available or the
one that it has selected.  [*See* dkt. 134-2 at 35-36.]

AUL does not claim that it selects for inclusion in its 401(k) offerings the share class with
the lowest expense ratio.  Rather it claim s, and Mr. Leimkuehler does not dispute, that it disclos-
es the total expenses associated  with the class of shares it has  selected for each mutual fund, in
other words, the bottom -line figure that participants  who choose to invest in the fund m ust pay.
[*See id.* at 36; 128-10 at 3; 128-16 ¶13.  *See also* dkt. 163 at 29 ("MR. BRUNO:  The trustee gets
an annual investment report that discloses…the net expense of the investment…[T]he total num-
ber doesn't just include the fund expense ratio, bu t also includes the adm inistrative charge…that
AUL collects.").]

### C.  "Revenue" or "Expense" Sharing

Most, but n ot all, of  th e m utual f unds that A UL m akes available to  trustees lik e Mr.
Leimkuehler engage in so-called "revenue," or perhaps more accu      rately "expense," sharing .
[Dkt. 128-1 ¶13 (noting that the  Vanguard funds do not pay revenue  sharing); 134-3 at 13.]  Un-

SA4

der that arrangem ent, mutual f und companies will rem it a p ortion of th e expense ratio charged against shares to entiti es like AUL that agree to invest in  the m utual fund com panies by letting 401(k) participants "buy" the shares.  [Dkt. 128-9 at 4.]  AUL's proffered justification for engag- ing in revenue sharing is that the revenue refle ct s the value A UL provides to the m utual fund for performing administrative services that the m utual fund would otherwise  have to perform—and may not in fact want to perform , for example, keeping track of m any small accounts.  [Dkt. 128- 16 ¶14.]  While Mr. Leimkuehler do es not dispute that at least so me of the expenses that were shared with AUL offset som e of the costs  the  Plan would have otherw ise had to pay AUL, he argues, and AUL does not dispute, that the offset was not completely one-to-one over the period in question.  [*See* dkt. 135-1.]  AUL did not disclose the ex istence of, or am ount to which it en- gaged in, revenue sharing to Mr . Leimkuehler.  [Dkt. 135-3 at 8.]   Indeed, Mr. Leimkuehler un- earthed an interna l AUL em ail in which AUL em  ployees expressed "signi ficant reservations about disclosing revenue sharing" to clients, like Mr. Leimkuehler.  [Dkt. 134-6 at 2-3.]  Am ong other reasons provided there, the author worried that disclosure would "only confuse[] the analy- sis of expenses—how the overall fund expense is split has no[] bearing on the total cost to the participants."  [*Id.*]

### D.  AUL's Universe of Mutual Funds

Trustees like Mr. Leim kuehler who choose to  have their plans do business with AUL must choose from  the lim ited universe of m utual funds that AUL m  akes available.  In 2000, when Mr. Leimkuehler first contracted with AUL, it offered only thirty-four funds, a number that grew over time to 383 by 2010.  [Dkt. 128-11 at 17;  128-18 at 15.]  Other than m utual funds of- fered by Vanguard, [ *see* dkt. 128-1 ¶13], AUL requires m utual fund companies who wish to do

business with AUL, and by extension with the 401(k) plans it services, to engage in som e form of revenue sharing with AUL, [dkt. 134-2 at 20-21].

From the universe of funds that AUL poten tially made available, Mr. L eimkuehler had the option to refine the choices and to select the specific funds that he wanted to offer to Plan participants as investm ent options. On at least two occasions, [dkt. 128-12; 128-14], Mr. Leimkuehler changed the mix of mutual funds made available for the Plan. He did s o in consul- tation with his investment advisor, Mr. Mazzone. [Dkt. 128-6 at 7.]

On two occasions, AUL unilaterally, as permitted under the contract, substituted one fund that it offered for another: In 2000, it sw apped S&P 500 funds, and in 2011, it swapped funds from Vanguard. [Dkt. 128-1 ¶13.]

### III.
### DISCUSSION

Mr. Leimkuehler has two rem aining substantive ERISA claim s against AUL.[3] The first arises under 29 U.S.C. § 1104(a)(1)(A), which require s a f iduciary of a plan to "discharge his duties with respec t to [ the] plan solely in the interest of the partic ipants and b eneficiaries and…for the exclusive purpose of …providing benefits to participants and their beneficiaries; and…defraying reasonable expenses of adm inistering the plan." His second claim arises under 29 U.S.C. § 1106(b)(3), the so-calle d prohibited-transaction statute. That latter statute provides: "A fiduciary with respect to a plan shall not…receive any consideration for his own personal ac- count from any party dealing with such plan in connection with a transaction involving the assets of the plan." Id. Mr. Leimkuehler contends that AUL violated both th ose statutes through its undisclosed revenue sharing that di d not result in a dollar-for-dolla r credit against the Plan's ex-

---

[3] In a previous ruling on AUL's motion for judgment on the pleadings, the Court held that a third claim sought only injunctive relief and would "onl y survive in connection with the substantive claims" set forth above, and the Court dismissed a fourth claim. [Dkt. 63 at 24.]

SA6

penses payable to AUL. [4]  Through the present motion, AUL seek s to establish that it could not have violated the statutes because th ey only apply to a "fidu ciary," and it was not a "fiduciary " with respect to the revenue sharing.

A person, including a cor poration like AUL, 29 U.S.C.  § 1002(9), can be a fiduciary un- der ERISA in three ways:

> [A] person is a fiduciary with respect to a plan to the extent
>
> (i)   he exercises any discretionary auth ority or discretionary control respecting management of such plan or exercise s any authority or control respecting management or disposition of its assets,
>
> (ii)  he renders investm ent advice for a  fee or ot her compensation, direct or indi- rect, with respect to any m  oneys or ot her property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the ad- ministration of such plan.

29 U.S.C. § 1002(21)(A).  According to th e U.S. Departm ent of Labor (the "DOL "), which has ERISA rulemaking and enforcement authority, applying those provisions "requires an analysis of the types of functions perform ed and actions taken by the person on  behalf of the p lan to d eter- mine whether particular functions or actions ar e fiduciary in nature….[The application of the provisions] is inherently factual…." U.S.  D.O.L Opinion Letter 97-16A, 1997 ERISA LEXI S 17, *10-11 (May 22, 1997).  As the Court considers the potential applicability of each subsection of 29 U.S.C. § 1002(21)(A), the Court m ust and will  adhere to the ev identiary record the parties have provided.

Before discussing the three subsections of  29 U.S.C. § 1002(21)(A), the Court m ust first discuss the "to the extent" limitation that appears in the main text of the section.

---

[4] The U.S. Departm ent of Labor has prom ulgated a  final rule that will go into ef  fect in Apr il 2012 that w ill generally require plan adm inistrators to dis close revenue sharing, like that which AUL received in this action.  *See* 76 Fed. Reg. 42542 (July 19, 2011) (to be codified at 29 C.F.R. § 2550.408b-2).

### A. How Does the "To the Extent" Limitation Apply to AUL?

ERISA's inclusion of the "to the extent" limitation in its definition of "fiduciary" reflects a congressional desire to make "people…fiduciaries when they do certain things but…entitle[] [them] to act in their own interests when they do others." *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) (citation omitted). Accordingly, when evaluating alleged breaches of fiduciary duty, "the threshold question is…whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

As Mr. Leimkuehler clarified at oral argument, his theory of the case is "share class, share class, share class." [Dkt. 163 at 24.] That is, when AUL chose which mutual fund share class to select for inclusion in its investment accounts, it did so on the basis of considerations of revenue-sharing implications, which it neither disclosed to the Plan nor specifically used to provide a dollar-for-dollar credit against the fees that the Plan paid directly to AUL.

Mr. Leimkuehler has argued that the to-the-extent limitation only applies to his claim under 29 U.S.C. § 1104(a)(1)(A) and not to his claim under 29 U.S.C. § 1106(b)(3). In other words, if AUL is a fiduciary for one purpose then he asks the Court to find it a fiduciary for all purposes for the prohibited-transaction statute. [*See* dkt. 136 at 38-41.] The Court cannot do so. The Seventh Circuit has been clear that 29 U.S.C. § 1002(21), which is incorporated by reference into the prohibited transaction statute via its use of the term "fiduciary," 29 U.S.C. § 1106(b)(3), "does not make a person who is a fiduciary for one purpose a fiduciary for every purpose." *Johnson*, 19 F.3d at 1188. Indeed, the only Seventh Circuit case that Mr. Leimkuehler has attempted to cite in support of that argument, *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), actually reinforces the importance of the focus on the to-the-extent limitation—the "key language in

- 8 -

the statutory definition," *id.* at 133. *See also id.* at 134 ("Because Engle and Libco were fiduciaries with r espect to th e selec tion and reten tion of the plan adm inistrators, the issue here is not whether they were fiduciaries but in stead whether their fiduciary duties extended to the Reliab le Trust investments in Berkeley, OSI and Hickory.").[5]

In the analysis that follows, the Court will, th erefore, evaluate AUL's potentia l fiduciary status through the lens of Mr. Leimkuehler's stated theory of the case: When AUL chose which mutual fund share class to select for inclusion in its investment accounts, it did so on the basis of considerations of revenue-sharing implications, which it neither disclosed to the Plan nor specifically used to provide a dollar-for-dollar credit against the fees that the Plan paid directly to AUL.

**B.  Does AUL's Revenue Sharing Implicate  "Authority o r Control Respecting the Management or Disposition of Plan Assets" under 29 U.S.C. § 1002(21)(A)(i)?**

As indicated above, 29 U.S.C. § 1002(21)(A)(i  ) m akes a person a fiduciary "to the ex tent…[(1)] he exercises any disc retionary authority or discretionary control respecting m anagement of such plan or [(2)] exercis es any authority or control respecting m anagement or disposition of its assets." Because Mr. Leimkuehler do es not argue that AUL ha d any discretionary authority or control over the management of the Plan, [ *see* dkt. 136 at 20], the Court will only discuss the latter a lternative. In so doing, the Court will first identify the Plan assets at issue and then consider the "ex tent" to which the evidence shows that the revenue-sh aring at issue results from AUL's "exercise[] [of] any authority o r control respecting [their] m anagement or disposition."

---

[5] The language that Mr. Leim kuehler quotes in his brief—that the " *per se* rules of [29 U.S.C. § 1106(b)(3)] make much simpler the enforcem ent of ERISA's more general fiduciary duties," *id.* at 123 (citation om itted)—does noth ing to adv ance his arg ument because it do es not specify *when* a person is a fiduciary. That analysis is, of course, governed by 29 U.S.C. § 1002(21)(A), which includes the to-the-extent limitation.

### 1.   The Plan Assets at Issue

Mr. Leimkuehler argues that AUL exercises authority or control respecting the management or disposition of two types of Plan assets: the accumulation units that Plan participants receive in exchange for their contributions and the separate accounts funded with participant contributions. [*See* dkt. 136 at 20-21.]

AUL does not dispute, [ *see* dkt. 143 at 11-12], that both items are Plan assets under ERISA, *see also* 29 C.F.R. § 2510.3-101(h)(1)(iii) ("[W]hen a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity …[a] separate account of an insurance company…."); *id.* § 2510.3-102(a)(1) ("[T]he assets of the plan include amounts…that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution…to the plan….").

AUL does, however, argue that Mr. Leimkuehler may not rely on a fiduciary theory founded upon AUL's use of separate accounts, which in its view was never pleaded in the Complaint. [Dkt. 143 at 11.]

While AUL is correct that Mr. Leimkuehler generally may not use his response to the motion for summary judgment to constructively amend his Complaint, *e.g.*, *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 693 (7th Cir. 2010) (collecting cases), Mr. Leimkuehler is not attempting to do so. His Complaint referenced AUL's use of separate accounts. [ *See* dkt. 1 ¶¶11, 15, 64.] AUL had notice that they may be, and now are, at issue on summary judgment. Accordingly, in the analysis that follows, the Court will consider 29 U.S.C. § 1002(21)(A)(i)'s applicability vis-à-vis both the money that AUL receives from the participants (plus any matching employer contributions) and the mutual fund shares that AUL maintains in the separate account.

- 10 -

**2. The "Extent" to Which AUL "Exercis [es] any Authority or Control Respecting Management or Disposition of [Plan] Assets"**

With respect to the rem aining part of 29 U.S.C. § 1002(21)(A)(i), which m akes a person a fiduciary "to the extent he exercises any authority or control respecting management or disposition of its assets," the parties dispute several aspects of the definition as it applies to AUL's revenue sharin g. For analytical conv enience, th e Court will work backwards throu gh the lega l standards governing definition. It will then add ress the DOL's re cent enforcement letter against AUL concerning the United Concrete W aukegan, Inc. 401(k) Retirement Plan (the "United Concrete letter"), [filed at dkt. 151-2], which Mr. Leim kuehler contends should significantly control the Court's analysis.

**a. "Any Authority or Control"**

The parties dispute what "any authority or control" means. Specifically, AUL argues that the authority or control over the Plan's assets must be discretionary in nature to potentially com e within the definition, thereby precluding instances in which AUL's authority or control is merely ministerial in nature—as when AUL carries out the Plan participants' instructions. [Dkt. 129 a t 15.] By contrast, Mr. Leim kuehler argues that "any" authority or control means what it says, so even ministerial authority or control will suffice.

While Mr. Leim kuehler has identified several ou t-of-Circuit author ities that he cla ims support his interpretation of the statute, his authorities are not controlling here. The Seventh Circuit has, on m ultiple oc casions, made cle ar that discr etion lies a t the heart of ERISA fiduciary status:

> A fiduciary is an agent who is required to treat his prin cipal with utm ost loyalty and care—treat him, indeed, as if the princip al were himself. The reason for the duty is clearest when th e agent has a br oad discretion the exercise of which the principal cannot feasibly superv ise, so that the principal is at the agent's m ercy. The agent might be the lawyer, and the prin cipal his client; or the agent might be

- 11 -

an investment adviser, and the principal   an orphaned child.  If the agen t has no discretion and the principal has a norm al capacity for self -protection, ordinary contract principles should generally suffice.  *At all events, ERISA makes the exist- ence of discretion a sine qua non of fiduciary duty.*  29 U.S.C. § 1002(21)(A).

*Pohl v. Nat'l Benefits Consultants* , 956 F.2d 126, 128-129 (7th Cir. 1992) (em phasis added and one citation omitted).  *Accord Hecker v. Deere & Co.*  ("<u>Hecker I</u>"), 556 F.3d 575, 583 ("In order to find that they were 'functiona l fiduciaries,' we m ust look at  whether either F idelity Trust or Fidelity Research exercised discretionary authority  or control over the management of the Plans, the disposition of the Pl ans' assets, or the adm inistration of the Plans.")  *reh'g denied Hecker v. Deere & Co.*  ("<u>Hecker II</u>") 569 F.3d 708 (7th Cir. 2009);  *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004) ("[A] person is deemed a fiduciary only 'to the extent' he or she exercises discre- tionary auth ority...."  ( citation om itted));  *Midwest Cmty. Health Serv. v. Am. United Life Ins. Co.*, 255 F.3d 374, 376 -377 (7th Cir. 2001) ("[ B]ecause AUL had discretionary  authority over the contract in its ability  to amend the value of the contract, AUL is an ERISA fiduciary."  (col- lecting cases)).

In light of the relevant authority from the Seventh Circuit, the Court need not and will not discuss Mr. Leim kuehler's o ther a uthorities.   Until the Se venth Cir cuit or the Sup reme Court hold otherwise—and he m akes no ar gument that either has yet  done so—AUL cannot be a fidu- ciary under 29 U.S.C. § 1002(21)(A  )(i) if AUL exer cised only non-discretionary authority and control respecting the management or disposition of the Plan's assets.

### b.  "Exercises" that Authority and Control

The parties also dispute what it means for a person to "exercise[] any authority or control respecting management or disposition of its assets."  29 U.S.C. § 1002(21)(A)(i).

Mr. Leimkuehler first argues that  if a provider like AUL rest ricts the universe of m utual funds that the provider offers to  plan sponsors to chose for inclus ion in their plans, the provider

has exercised discretionary authority and contro l over how the plan can invest its assets. [ *See* dkt. 136 at 26-32.] AUL m aintains that *Hecker I*, an ERISA revenue-sharing case, forecloses Mr. Leimkuehler's argument.

AUL is correct. The Seventh Circuit suggested in *dicta* that plan sponsors can lim it the selection of funds availa ble to their plan participants withou t implicating "authority or control" over plan management or assets. *Id.* ("We see nothing in [ERISA] th at requires plan fiduciaries to include any particular mix of investment vehicles in their plan. That is an issue, it seems to us, that bears more resemblance to the basic structuring of a Plan than to its day-to-day management. We therefore question whether Deer e's decision to restrict the dir ect investment choices in its Plans to Fidelity Research funds is even a deci sion within Deere's fiduci ary responsibilities.").[6] By implication, the Seventh Circuit should expre ss the same skepticism when vendors like AUL restrict the products that they are willing to sell to plan sponsors.[7] Given Mr. Leimkuehler's ina-bility to point to any Seventh Circuit or Supr eme Court authority th at would affirmatively ap-prove his argument, [*see* dkt. 136 at 24-30], the Court will fo llow the Seventh Circuit's techni-cally non-binding lead and reject it, *cf. Hendricks County Rural Electric Membership Corp. v. NLRB*, 627 F.2d 766, 768 n.1 (7th Cir. 1980) ("A di ctum in a Supre me Court opinion m ay be

---

[6] Mr. Leimkuehler h as a rgued tha t s uch a propo sition is in consistent with the DOL's of ficial commentary of its regulations. [*See* dkt. 136 at 27 (discussing "footnote 27" in the Final Regula-tion Regarding Participan t Directed Individual Account P lans (ERISA 404(c) Plans), 57 FR 46906-01).] The Seventh Circuit has obviously, though implicitly, concluded otherwise. Indeed, the Fif th Circuit has ex plicitly ref used to give that pa rticular comm entary any weight. *See Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 311 (5th Cir. 2007).

[7] In its opinion denying rehearing, th e Seventh Circuit stressed that the plaintiffs did not allege that the mutual funds that were included within the investm ent universe "were unsound or reck-less….They argued… that th e Plan s were flawed because Deere decid ed to accep t 'retail' fees and did not negotiate presum ptively lower 'wholesale fees.'" *Hecker II*, 569 F.3d a t 711. The Court notes that Mr. Leimkuehler here m akes no argument that the m utual funds that AUL of-fered to him were in any way unsound investments.

SA13

brushed aside by the Suprem e Court as dictum when the ex act question is late r presented, but it cannot be treated lightly by inferior federal courts until disavowed by the Supreme Court.").

Otherwise, under Mr. L eimkuehler's view of ERISA, entities like AUL would be forced to offer every m utual fund in th e marketplace or face the increased costs—to b e passed on to plan participants—that come with being a fiduciary.  Both are unpalatable outcomes not required by the plain text of ERISA or binding preced ent.  *See Hecker II*, 569 F.3d at 711 (emphasizing that *Hecker I* was not m eant to endorse the notion that   "any Plan fiduciary can  insulate itself from liability by th e simple expedient of including a very larg e number of investment alterna- tives in its portfolio an d then  shifting to the participan ts the responsibility for cho osing among them" because such a strategy "would place an unreasonable burden on unsophisticated plan par- ticipants who do not have the resour ces to pre-screen investment alternatives.").  And persuasive precedent from other jurisdictions likewise suggests the same.  [*See* dkt. 143 at 4 (collecting out- of-Circuit cases holding that sele cting a universe of funds to offe r to a plan is not a fiduciary function).]

AUL does, however, concede—and the Court fi nds—that the requisite authority and con- trol would be present when it exercises its contractual "right to eliminate the shares of any of t he eligible Mutual Funds, Portfolios, o r other en tities and to sub stitute shares of, or interest in, an - other Mutual Fund, Portfolio, or   another investm ent vehicle, fo r shares already purchased" by Plan Participants, [dkt. 128-11 at 6].  [*See* dkt. 129 at 19.]

While Mr. Leim kuehler contends that the failu re to exercise a contractual power to sub- stitute or delete m utual funds th at participants have already "pur chased" constitutes an exercise of authority of control, [ *see* dkt. 136 at 30 (arguing that "[t]he act of lim iting the universe is not something AUL does at one discrete point in time; it does so on a constant, ongoing basis.")], the

- 14 -

Court must reject that proposition.  He was una ble to cite to any Seventh Circuit or Supreme Court authority for that novel read ing of what it m eans to "exercise[]" authority or control.  *See American Heritage College Dic tionary* (3d ed. 1997) (defining "to exercise" as "[t] o put into play or operation; employ").  Absent such authority, the Court finds that Congress was clear that affirmative action is required; om issions do not suffice.  *Trs. of the Graphic Commun. Int'l Union v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008) ("An act of omission fails to satisfy the requirement that the individual exercise discretionary authority over plan assets.").

Furthermore, again without citing any author ity, Mr. Leim kuehler also argues that whe n 401(k) plan providers like AUL choose among share classes for in clusion in their pre-selected menu of options for plan sponsors, the providers are exercising authority and control for the purposes of 29 U.S.C. § 1002(21)(A)(i).  But the Cour t agrees with AUL, [dkt. 143 at 5 n.2], that if a provider can limit the mutual funds it will offer to plan sponsors, it can likewise select to only deal with particular share classes.

In summary, under existing Seventh Circuit law, when a provider offers plan sponsors a pre-selected universe of mutual funds of pre-selected share classes that plan sponsors can choose to include in their plans or not, the provider is not exercising "authority or control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A)(i).  Providers do, however, exercise such authority and control wh en they unilaterally change the investm ent choices that participants have already made.

### c.  The United Concrete Letter

After the briefing on summary judgment had been completed, Mr. Leimkuehler requested and received leave to file suppl emental evidence concerning the DOL's United Concrete Letter. [*See* dkt. 152.]  There, a DOL regiona l office sent a prelim inary enforcement letter dated Sep-

SA15

tember 28, 2011, to AUL concerning an  AUL offered 401(k) plan that  is in all material respects the same as the one at is sue here.  [*See* dkt. 153-2 *to* -5.]  The DOL had been investigating alle-gations that AUL had knowingly tran sferred certain plan  assets directly to  the plan sponsor, in violation of ERISA.  [*See* dkt. 151-2 at 3.]  Acc ording to the enforcem ent letter, A UL was pro-hibited from doing so  not only because it was a "par ty in interest" to  the plan under 29 U.S.C. § 1002(14)—a status not relevant to this m otion—but also because AUL was a "fiduciary" under 29 U.S.C. 1002(21)(A)(i).  The only reasoning that  the United Concrete letter offered regarding the assertion of fiduciary  status was that "AUL  was responsible for th e selection of investm ent options that were made available under the [contract] and for adding and deleting investment op-tions available to the Plan."   [Dkt. 151-2 at 2.]  In Mr. Leimkue hler's view, the DOL's finding should likewise control here with respect to the  issue of AUL's fiduciary status under 29 U.S.C. § 1002(21)(A)(i).

After having considered the letter, the Court do es not find that it al ters any of the legal conclusions above, for several reasons.  First,    and perhaps most im portantly, the letter is only preliminary—a warning  of possib le litiga tion r ather than  a form al ruling of the D OL.  Conse-quently, the letter is no t subject to  *Chevron* deference.[8]  *See Christensen v. Harris County* , 529 U.S. 576, 587 (2000) (citations om itted) ("Interp retations such as those in opinion letters—like interpretations contained  in policy statem ents, agency manuals, and enforcem ent guidelines, all of which lack the force of law—do not warrant  *Chevron*-style deference.").  Second, it is essen-tially conclusory with re spect to the f iduciary-status issue, which f orms the heart of  this action. As such, the letter does not pr ovide the Court with reasoning that    might help s ituate the lette r within the contours of existing  Circuit precedent.  Finally, insofar as th e DOL maintains that di-

---

[8] Like all agency documents, it is still "entitled to respectful consideration," *Carter v. AMC LLC*, 645 F.3d 840, 844 (7th Cir. 2011), which the Court has provided to it.

verting plan assets renders a   person a fiduciary under 29 U.   S.C. § 1002(21)(A)(i), the Court

agrees, as did AUL at or al argument, because, as explained above, a diversion constitutes an ex-

ercise of discretion.  In this   action, however, Mr. Leim kuehler has presented neither argum ent

nor evidence that AUL ever d iverted assets fro m whether Plan participants d irected that they be

sent.

### 3.  The Evidence Here

Mr. Leimkuehler presents two theo ries as to  why AUL qualifies as a fiduciary under 29

U.S.C. § 1002(21)(A)(i).  First, AUL "established, owns and controls the separate account and its

'investment accounts, ' and AUL determ ines th e value o f investm ent account accum ulation

units." [Dkt. 136 at 2.]  Second, "AUL selects a nd limits the investment options available to the

Plan." [*Id.*]

### a.  The Separate Accounts and Investment Accounts

With respect to the first theory, the undisputed evidence establishes that Mr. Leimkuehler

is correct as a factual m atter.  AUL receives Plan contributions and places them in a separate ac-

count, held under AUL's own na   me, and then allo cates the contributions into investm ent ac-

counts according to the mutual fund that Plan participan ts choose to "buy." [ *See, e.g.*, dkt, 128-

11 at §§ 1.15, 9.1; dkt. 134-3 at 7.]  AUL then determ   ines the value of the accum ulation units

that participants receive according to a pre-dete  rmined, contractually disclosed formula.  [Dkt.

128-11 at §§ 5.3-5.4.]

Except in two instances, which the Court will set aside for the moment, none of those ac-

tivities render AUL a fiduciary  under 29 U.S.C. § 1002(21)(A)(i) as  a matter of law.  W hile the

separate accounts and investment accounts are Plan assets, the ev idence does not show any exer-

cise of discretion on AUL's part, m  eaning that  AUL exer cised none of the required "authority

- 17 -

SA17

and control."  There is no evidence that AUL absconded with any Plan assets, that AUL provided accumulation units for one fund when the p  articipants thought they were buy ing another, that AUL purchased a share class that resulted in hig her expenses than the expenses disclosed to the participant, or that AUL f  ailed to properly ap  ply the valuation f  ormula to the a  ccumulation units—a ministerial calculation, *Beddall v. State St. Bank & Trust Co.*  , 137 F.3d 12, 20 (1st Cir. 1998) ("Without m ore, mechanical adm inistrative responsibilities (such as retaining the assets and keeping a record of their valu e) are insufficient to ground a claim of fiduciary status." (cita-tions omitted)).

The narrow two exceptions, which ultim ately d o not cre ate an issue of  fact prec luding summary judgment either, occurred when AUL unilaterally substituted one mutual fund that Plan participants had purchased for another.  AUL did so in 2000, when it "substituted the SSGA 500 Fund for the Fidelity S  &P 500 Fund." [Dkt.   128-1 ¶13.]  The other occurred in 2011, when "AUL substituted the V anguard Insurance Fund Small Company Growth Portfolio for the Van-guard Explorer Fund."  [ *Id.*]  AUL argues, [ *see* dkt. 129 at 20], and Mr  . Leimkuehler does not dispute, [*see* dkt. 136], that any liability for the f irst substitution is barred by ERISA's statue of repose, 29 U.S.C. § 1113(1),  [9] and that no liability under 29   U.S.C. § 1106(b)(3) can attach for the second because to the extent that AUL exerci sed control over the Plan assets inv olving Van-guard funds, neither Vanguard fund involved revenue sharing.

The Court, therefore, finds that AUL        is entitled to summary judgm     ent on Mr. Leimkuehler's first theory as to why AUL is a fiduciary under 29 U.S.C. § 1002(21)(A)(i).

---

[9] In connection with the pending m otion for clas s certification, Mr. Leim kuehler briefly argued that no time limit was required for the class defi nition because of the potential for to lling. [ *See* dkt. 122 at 47.]  Given that neither Mr. Leim kuehler's papers on summary judgment, nor his oral argument, dispute the time-barred status of the 2000 substitution, the Court can forgo any further discussion of it.  *See* Fed. R. Civ. Pro. 56(c)(3) ("The court n eed consider only the cited m ateri-als….").

### b.  The Menu of Mutual Funds

Mr. Leimkuehler also correctly argues that the undisputed evidence establishes that AUL limits the mutual funds that he m    ay select   for inclusion in the Plan.  In 2000, when Mr. Leimkuehler initially contracted with AUL, he    understood and agreed th at AUL's universe of mutual funds was lim ited to thirty four, whic h were disclosed.  [Dkt. 128-11 at 17.]  By 2010, that universe had grown to 383, [dkt. 128-18 at 15]    , still a sm all fraction of the thousands of funds available in the marketplace, *Hecker I*, 556 F.3d at 586.

As discussed above, ho wever, merely limiting the universe of funds an entity will o ffer, and their share classes, do not    render the entity a  fiduciary under 29 U.S.C. § 1002(21)(A)(i). When AUL did so here, it did not  exercise the requisite discreti onary authority and control over the ultim ate dispo sition of  Plan as sets be cause Plan par ticipants u ltimately d ecided f or them - selves whether or not to invest   in a particular mutual fund.     AUL m erely followed their direc- tions.

### C.  Does AUL' s Revenue Sharing Implicate any "Investment Advice" Under 29 U.S.C. § 1002(21)(A)(ii)?

The definition of fiduciary under 29 U.S.C.   § 1002(21)(A)(ii) contains several elem ents, but only one is ultim ately relevant here:  the statutory requirem ent that the p erson "render[] in- vestment advice."  The   other e lements do not   matter, and  will not b e discussed, because th e Court finds that the evidentiary record fails to    create an issue of fact about whether AUL ren- dered investment advice for the Plan.  It did not.

The DOL has prom ulgated a regulatory gl oss for 29 U.S.C. § 1002(21)(A)(ii), w   hich among other things, requires that the person "render[] advice to the plan as to the value of securi- ties or other property, or m akes recommendation as  to the advisability of investing in, purchas- ing, or selling securities or ot her property."  29 C.F.R. § 2510.3- 21(c)(1)(i).  Only the second of

SA19

those alternatives—making a "recommendation as to the advisability of investing in, purchasing, or selling securities or other property"—is potentially at issue.  [*See* dkt. 136 at 34 (only arguing the second alternative).]

According to Mr. Leimkuehler, and confirmed at oral argument, the only "recommendation" that he claims AUL made about whether the Plan should purchase mutual funds was an implicit one:  By marketing a discrete menu of mutual funds that trustees like Mr. Leimkuehler could choose from, AUL was, in his view, implicitly recommending that the Plan buy those funds, as compared to all others.  [*See* dkt. 163 at 102.]  The Court must reject that claim, on both legal and factual grounds.

As a matter of law, simply offering a discrete menu of funds does not constitute investment advice here in the Seventh Circuit.  In *Hecker I*, the Seventh Circuit held that Fidelity Trust was not a fiduciary to the plan at issue even though it provided a "menu" of mutual funds that the plan sponsor could choose to include in the ERISA plan.  556 F.3d at 583.  If the implicit-recommendation-theory that Mr. Leimkuehler advances were correct, *Hecker I* would have been decided differently.

As a matter of fact, based on the uncontroverted evidence in the record, Mr. Leimkuehler's claim that AUL was providing implicit investment advice also fails.  From the beginning of the Plan's relationship with AUL, Mr. Leimkuehler used a third-party advisor, Marco Mazzone, "for advice [as] to what stocks and items should be in the plan…." [Dkt. 128-6 at 7.]  Furthermore, the annual reports that AUL provided about the mutual funds that he could select for inclusion in the Plan had no evaluative commentary about the appropriateness of particular funds, instead presenting only information like expenses and historical return information, [*see* dkt. 134-12, 134-13, 138], information that the DOL has determined fall outside the scope

- 20 -

of investment advice, *see* 29 C.F.R. § 2509.96-1(d)1)(ii) (excl uding from "investment advice" information about "investment alternatives under the plan (*e.g.*, descriptions of investment objectives and philosophies, risk and re turn characteristics, historical  return inform ation, or related prospectuses objectives and philoso phies, risk and return characteri stics, histori cal return infor-mation, or related pros   pectuses)." (footnote om  itted)).  Indeed, the Court notes that M     r. Leimkuehler's Statem ent of Material Facts        in Dispute contains no assertion that Mr. Leimkuehler himself believed that AUL implicitly recommended the "advisability" of the mutual funds it had partnered with.

Accordingly, the Court finds that the uncontroverted evidence establishes that AUL is not a fiduciary under 29 U.S. § 1002(21)(A)(ii).

### D.  Does AUL's Revenue Sharing Implicate any "Discretionary Authority or Discretionary Responsibility" in     the Plan's Adminis     tration under 29 U.S.C. § 1002(21)(A)(iii)?

As previously indicated, § 1002(   21)(A)(iii) requires  that AUL have "discretionary au-thority or discretionary responsibil ity in the adm inistration of [the] plan."  Before the Court can decide whether the evidence would support such a finding, however, the Court must first address AUL's argument that Mr. Leim kuehler may not re ly upon that theo ry because he did not tim ely disclose it.

### 1.  Untimely Disclosure of § 1002(21)(A)(iii) as a Theory

Invoking cases holding that a pa rty m ay not inject new clai ms into a case once it has reached summary judgment, *see, e.g.* , *Auston v. Schubnell* , 116 F.3d 251, 255 (7th Cir. 1997), AUL seeks to preclude Mr. Leim  kuehler from  relying upon § 1002(21)(A)(i ii) in response to AUL's motion for summ ary judgment . [Dkt. 143 at 14.] As Mr . Leimkuehler freely concedes via surreply, he "did not  plead this theory of fiduciary status in his complaint, and he did not de-

scribe it in his [contention] inte rrogatory answer," which m erely objected to hav ing to prov ide

any contentions and referred AUL back to the Complaint.  [Dkt. 146 at 1.]

AUL is righ t to criticize Mr. Le imkuehler for hiding th e ball regarding this legal the ory

that he wish ed to pursue.  No litigan t in federa l court should ever have to guess what claim s or

defenses are at issue.  *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (ex-

plaining that liberal discovery under the Federal  Rules was designed to m ake "trial less a gam e

of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest

practicable extent.").  Had the Court been presented with Mr. Leimkuehler's objection to answer-

ing a con tention interrogatory before it b ecame at issue here, the Court  would have overruled it

and ordered him to answer based on what he kne w at the time and supplem ent it later if discov-

ery implicated additional theo ries.  *See* Fed. R. Civ. Pro. 33(b)(2) ("An  interrogatory is not ob-

jectionable merely because it asks for an opinio n or contention that relates to fact or the applica-

tion of law to fact…."); Fed. R. Civ. Pro. 26(e) (requiring parties to update their responses to dis-

covery requests when n ew material information becomes available).  *See also Ryan v. Mary Im-*

*maculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (explaining that, given the liberal notice-

pleading standards in federal cour t, defendants should be able to  pose contention  interrogatories

"at the outset of litigation, before costly discovery is undertaken").

Notwithstanding Mr. Leim kuehler's erroneous re fusal to an swer a legitim ate contention

interrogatory and failure to seek an  appropriate amendment of his complain t, the Court will no t

preclude him  from seeking to invo ke § 1002(21)(A)(iii).  He disclo sed that fiduciary theory in

his briefing on class certification, which predat ed AUL's motion for summary judgm ent. [ *See*

dkt. 122.]  Consequently, AUL appropriately con ceded at oral argum ent that it has suffered no

prejudice from Mr. Leimkuehler's earlier nondisclosure.  Absent prejudice to AUL from his mis-

step, Mr. Leim kuehler is entitled to be heard on the m erits.  Fed. R. Civ. Proc. 61 ("At every

stage of the proceeding, the court must disregard all errors and defects that do not affect any par-

ty's substantial rights."); *Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).

## 2.  Applying § 1002(21)(A)(iii)

Turning now to the m erits of 29 U.S.C. § 1002(21)(A)(iii), Mr. Le imkuehler argues that

because AUL has contractually reserved for itself multiple powers to unilaterally alter the Plan's

administration, it "has…discretionary authority or di scretionary responsibility in the adm inistra-

tion of such plan," 29 U .S.C. § 1002(21)(A)(iii).  Specifically, Mr. L iemkuehler cites, [dkt. 136

at 37-38], AUL's contractual rights to do the follo wing as implicating discretionary authority in

the Plan's administration:

- AUL's right "to m ake additions to, dele tions from, substitu tion for, or com bina-
  tions of, the securities that are held by the Investm ent Account," [dkt. 128-11 at §
  3.3(a)];

- AUL's right "to elim inate the shares of a ny of the eligible Mutual Funds, Portfo-
  lios…if further investment in any or  all eligib le Mutual Fu nds…becomes inap -
  propriate in view of the purposes of the contract," [*id.*];

- AUL's right "to transfer assets from any  Investment Account to another separate
  account of AUL or Investment Account," [*id.* at § 3.3(b)]; and

- AUL's right to com bine one or m ore I nvestment Accounts and [to] establish a
  committee, board or other group to manage one or more aspects of the Investment
  Accounts," [*id.* at § 3.3(c)].

AUL does not deny that those cont  ractual rights im plicate discre tionary adm inistration of the

Plan. [*See* dkt. 143 at 14-15.]

AUL does, however, co rrectly argue that it is entitled to su mmary judgment because Mr.

Leimkuehler has not demonstrated how any of that   discretion im plicates the selection of share

classes, and resulting reve nue sharing, alleged here.    *See generally Chicago Bd. Options Ex-*

*change, Inc. v. Conn. Gen. Life Ins. Co.  *, 713 F.2d 254, 259 (7th Cir. 1983)  ("It is important to

remember that if Connecticut Gen eral is a fid uciary because of the power to amend [the co n-
tract], this status only governs actions taken in regard to amending the contract and does not im-
pose fiduciary obligations upon Connecticut Genera l when taking other actions.").  For both 29
U.S.C. § 1104(a)(1)(A) and 29 U.S.C. § 1106(b)(3),   the to-the-extent lim itation inherent in the
statutory definition of "fiducia ry" precludes a finding that AUL   was a cting as a fiduciary with
respect to the revenue sharing that took place here.  Mr. L eimkuehler has introduced no evidence
that AUL's used its d iscretionary adm inistrative power—which he does not contend it eve     r
used—to impact Plan participants' decisions about  whether they wanted to invest in the m utual
funds that Mr. Leim kuehler decided to m ake a vailable to them , given the total expenses dis-
closed to them.  Some participants chose to invest in Vanguar d funds, which never paid revenue
sharing.  Others invested in funds that, unbeknow nst to them, engaged in revenue sharing with
AUL—a pr actice that, from  this re cord, did not result in P lan pa rticipants paying more in ex-
penses than was disclosed and which m ay, in fact , have ultim ately reduced overall expenses of
the Plan.

Accordingly, the Court finds that AUL   entitled to summary judgm ent as a m atter of
law that it could not have viol ated any of the claim ed fiduciary duties that ERISA imposes.  *See*
*generally* Opinion 97-15A, 1997 ERISA LEXI S 18, at *10- 11 (May 22, 1997) ("[I]t is generally
the view of the Departm ent that if a trustee acts pursuant to a   direction…and does not exercise
any authority or control to cause a plan to invest  in a mutual fund, the mere receipt by the trustee
of a fee or other com pensation from the m utual fund in connection with the investm ent would
not in and of itself viol ate section 406(b)(3).");  *Tibble v. Edison Intern* ., 639 F. Supp. 2d 1074,
1091 (C.D. Cal. 2009) (holding that where "decisions that resulted in the generation of…revenue
sharing" did not arise from  the exercise of the  defendant's discretionary authority, the defendant

- 24 -

"cannot be a fiduciary with respect to those decisions, and therefore, cannot be liable for simply receiving the consideration from those transactions.").

## IV.
### CONCLUSION

In light of *Hecker*, 401(k) providers do not become fiduciaries merely by limiting the universe of mutual funds providers offer to 401(k) plans. Nor do they become fiduciaries merely by receiving shared revenue from those funds upon execution of plan participants' investment instructions to whom the total expense of the investment was accurately disclosed. *See Hecker*, 556 F.3d at 585 (rejecting "the proposition that there is something wrong, for ERISA purposes," with that type of arrangement). Given those legal propositions and the other Seventh Circuit authority governing the issues raised, Mr. Leimkuehler has failed to present evidence or argument that would enable him to prevail in this action. AUL's motion for summary judgment, [dkt. 127], is **GRANTED**.

01/05/2012

**Distribution via CM/ECF:**

Klint L. Bruno
KOREIN TILLERY LLC
kbruno@koreintillery.com

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

SA25

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Joel S. Feldman
SIDLEY AUSTIN LLP
jfeldman@sidley.com

Bart A. Karwath
BARNES & THORNBURG LLP
bart.karwath@btlaw.com

Robert L. King
KOREIN TILLERY, LLC
rking@koreintillery.com

Robert D. MacGill
BARNES & THORNBURG LLP
rmacgill@btlaw.com

Eric S. Mattson
SIDLEY AUSTIN LLP
emattson@sidley.com

Sarah H. Newman
SIDLEY AUSTIN LLP
snewman@sidley.com

Dennis P. Stolle
BARNES & THORNBURG LLP
dstolle@btlaw.com

Eric Hyman Zagrans
eric@zagrans.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROBERT LEIMKUEHLER, as Trustee of and on        )
behalf of LEIMKUEHLER, INC. PROFIT SHAR-         )
ING PLAN,                                        )
     *Plaintiff*,                                 )
                                                 )
  *vs.*                                        )   1:10-cv-00333-JMS-TAB
                                                 )
AMERICAN UNITED LIFE INSURANCE COMPA-            )
NY,                                              )
     *Defendant*.                                )

## **ORDER**

Presently before the Court is Plaintiff / C      ounter-defendant Robert Leimkuehler's (the

"Trustee") motion to dism    iss Defendant / Counter-p    laintiff Am erican United Life Insurance

Company's ("AUL") Counterclaims.  [Dkt. 68.]

## I.
### STANDARD OF REVIEW

The Federal Rules im pose only a notice-pleading requirem ent for com plaints and coun-

terclaims.  Thus, "[s]pecific facts are not necessary; the [plainti ff] need only 'give the defendant

fair notice of what the claim  is and the grounds upon which it rests.'     *Erickson v. Pardus*, 551

U.S. 89, 93 (2007) (quoting  *Bell Atlantic v. Twombly*, 550 U.S. 544 (200 7) (alteration omitted))

(per cu rium).  *See also Vincent v. City Colleg  es of Chica go*, 485 F.3d 919, 923-24 (7th Cir.

2007) ("Facts that substantiate the claim ultimately must be put into evidence, but the rule 'plain-

tiff needs to prove Fact Y' does not im ply 'plaintiff must allege Fact Y at  the outset.' That's the

difference between fact pleading (which the courts of Illinois use) and claim pleading under Rule

8." (citation s omitted)).  Nonetheles s, "a com plaint may be so sketchy that the co  mplaint does

not provide the type of notice of the claim  to which the defendant is entitled." *Airborne Beepers*

SA27

*& Video, Inc. v. AT&T Mobility LL C*, 499 F.3d 663, 667 (7th Cir. 2007) (synthesizing *Erickson* and *Twombly*). In that circumstance, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is proper. A motion filed under that rule asks whether the complaint (or counterclaim) "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. 544). For the purposes of that rule, the Court will ignore legally conclusory allegations. *Id.* at 1949-50 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." (quotation omitted)).

## II.
### BACKGROUND

In the underlying case, the Trustee has sued AUL, a 401(k) administrator, under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101, *et seq.* He alleges that both he and AUL are fiduciaries of the Leimkuehler, Inc. Profit Sharing Plan (the "Plan") and that AUL has breached its fiduciary duties with respect to the Plan. The Court described the Complaint's allegations in detail when ruling upon AUL's motion to dismiss.[1] [*See* dkt. 63 at 2-7.] Essentially, the Trustee accuses AUL of profiting from a revenue sharing arrangement with many of the investment vehicles that AUL offers to the Plan's participants. [*See* dkt. 1 ¶¶9-10, 20, 23.] Those revenue-sharing payments, the Trustee alleges, have conferred a "windfall[]" on AUL. [*Id.* ¶57.] Additionally, "irrespective of AUL's status as an ERISA fiduciary," a status that AUL denies, the Trustee alleged, in a count that the Court ultimately dismissed, that the revenue-sharing payments have prevented him "from discharging [his] ERISA … fiduciary duty" to

---

[1] The motion was granted in part and denied in part.

SA28

the Plan, [*id.* ¶ 68(a)], specifically the "duty to 'defray[] reasonable exp enses of adm inistering' [the Plan], as is [his] duty under ERISA § 404(a)," [dkt. 1 ¶72 (first alteration in original)].

While AUL denies that it is actu ally a fiducia ry with resp ect to the Plan, [dkt. 67 at 7 ¶32], AUL asserts its Counterclaims in the event that it is wrong about its fiduciary status, [ *id.* at 23 ¶1]. It alleges that the Trustee "approved the investm ent options made available" to the Plan and indeed "had the authority and responsibility    to m ake the ultim ate decision as to which in-vestment options were appropriate for the Plan participants." [*Id.* at 25 ¶¶11-12.] It says that the total expenses that Plan participan ts paid were accurately described and that the revenue-sharing payments reduced the fees that AUL direct ly charged the Plan and participants. [ *Id.* at ¶15.] So if any technical vio lation of ERISA occurred by the failure to  accurately itemize the distribution of expenses, the Trustee is partially responsib le too because ERISA fiduciaries m ust ensure that their co-fiduciaries don't breach their fiduciary duties. [*Id.* at 26-27 ¶22.]

## III.
### DISCUSSION

AUL's Counterclaims are sty led in five counts, each of which the T rustee seeks to dis-miss. Through Counts I and II, AUL seeks, respectively, contribution and indem nity under ERI-SA. [*Id.* at 26-28.] Counts III and IV  seek the same relief, albeit under common law rather than ERISA. [ *Id.* at 28-30.] Finally, through Count V, AUL accuses the T     rustee of breaching his own fiduciary duties; therefore, AUL sues on the Plan's behalf pursuant to 29 U.S.C. § 1132(a). Each count depends upon the Trustee prevailing in his allegation      that AUL is, in fact, a co-fiduciary of the Plan, a status that AUL denies that it has.

### A.  Counts I and II:  Contribution and Indemnity under ERISA

- 3 -

The Trustee makes several arguments as to why the Court should dismiss Counts I and II. First, it says that the Seventh Circuit author ity recognizing contribution and indemnity rights under ERISA, *Free v. Briody*, 732 F.2d 1331 (7th C ir. 1984), is no longer good law.  Second, even if *Free* remains good law, the Trustee says that it doesn't perm it contribution or indem nity where, as h ere, an active fiduciary seeks to recover from a passive fiducia ry.  Finally, again assuming that ERISA recognizes any claims for contribution or indemnity at all, the Trustee denies that any recovery under 29 U.S.C § 1105(a) is available.

### A.  The State of *Free*

In *Free*, the Seventh Circuit interpreted 29 U.S.C. § 1109(a), which reads as follows:

> Any person who is a fid uciary with respec t to a plan who breaches any  of the re
> sponsibilities, obligations, or duties im posed upon fiduciaries by this subchapter
> shall be personally liable to m ake good to such plan any losses to the plan resu lt
> ing from each such breach, and to resto re to su ch plan any  profits of such fidu
> ciary which have been m ade through use of assets of the plan by the fiduciary,
> and shall be subject to such other equita ble or remedial relief as the court m  ay
> deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).  Based largely on ERISA's le gislative history, the Seventh Circuit decided that when Congress gave courts the power to award "such other equitable or rem  edial relief," it gave "courts the power to shape an award so as to make the injured plan whole while at the same time apportioning the dam ages equitably between the wrongdoers," such as by indemnity,  *Free*, 732 F.2d at 1337, or by contribution.[2]

The Trustee argues that *Free* no longer remains good law aft er one or more of three later Supreme Court decisions, none of which specifica lly considered indemnification or contribution

---

[2] *Free* only involved a claim for indemnity.  The Trustee makes no argument, however, that *Free* failed to authorize contribution, a closely relate d concept.  The only difference between the two is that the former involves complete recovery of damages paid, while the latter involves only partial recovery.  *See Donovan v. Robbins*, 752 F.2d 1170, 1178 (7th Cir. 1985) (citation omitted).

SA30

between co-fiduciaries.  The first case is *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985), which held that equitable  relief under 29 U.S.C. § 1109(a) m ust inure the benefit of the benefit plan as a whole.  *Id.* at 140-42.  According to the Trustee, because contribution and indemnity only benefit the co-fiduciary and not the plan as whole, *Free*'s recognition of those theories under 29 U.S.C. § 1109(a) m ust give way.  Plus, the Trustee m aintains that indemnity and contribution aren't expressly m entioned in the statu te; therefore, permitting th em would violate the Supreme Court's directive against implying ERISA remedies beyond those that Congress authorized "expressly," *Russell*, 473 U.S. at 146.  The other two Suprem e Court cases reinforce the express-provision requirement for remedies.  *See Mertens v. Hewitt Associates*, 508 U.S. 248, 254 (1993) (quoting  *Russell*, 473 U.S. at 146-47);  *Great-West Life & A nnuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002) (quoting  *Mertens*, 508 U.S. at 251 and  *Russell*, 473 U.S. at 147).

District courts in th is C ircuit hav e split as to w hether the Suprem e Court au thority discussed above so undermines the rationale in  *Free* that *Free* itself must be said to be overturned.  *See BP Corp. N. Am. v. N. Trust Invs., N.A.* , 692 F. Supp. 2d 980, 983-84 (N.D. Ill. 2010) (collecting conflicting cases).  This Court, however, finds  *Free* to still be binding precedent because it is directly on point and none of  the Supreme Court cases the Trustee has cited specifically address contribution and indemnity rights.  W hen subsequent Supreme Court authority undermines the rationale of earlier Suprem e Court authority that oth erwise directly ad dresses the legal issu e under consideration, the Suprem e Court has commanded lower courts to continue to follow the on-point authority.  *Agostini v.  Felton* , 521 U.S. 203, 237 (1997) ("We reaffirm that if a precedent of this Court has direct ap plication in a  case, yet appears to rest on reason s rejected in some other line of decisions, the Court of Appeals should follow the case which directly con-

SA31

trols, leaving to this Court the prerogative of overruling its own decisions." (quotation omitted)). The Seventh Circuit appears to adopt a similar view of its own precedents that have only been implicitly overturned by the Supreme Court—in other words, trial courts should follow the Seventh Circuit authority if it is on point and not in conflict with the exact question presented by later Supreme Court authority. *See SEC v. Wealth Mgmt. LLC* , 628 F.3d 323, 330 n.3 (7th Cir. 2010) ("[O]ur decision in *Wozniak* was…undermined by the Supreme Court's decision in *Devlin v. Scardelletti*, 536 U.S. 1, 122 S. Ct. 2005, 153 L. Ed. 2d 27 (2002). Recognizing this, we overruled *Wozniak* in *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009)…."). Thus, the Court will not presume to declare invalid a decision of its supervising Court of Appeals, especially one that the Court of Appeals has continued to cite as recently as 1998, *see Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir. 1998) (citing *Free*'s approval of indemnity between co-fiduciaries), a date after two of the three Supreme Court cases the Trustee has identified.

## B.  AUL's Contribution and Indemnity Claims under *Free*

In arguing that AUL fails to state a claim for relief under *Free*, the Trustee focuses on the following passage from the opinion: "Congress clearly did not intend trustees to act as insurers of co-trustees' actions, and the only question that remains is whether [apart from a statutory provision not at issue here] a co-trustee…can… recoup his loss from his more culpable co-trustee. We believe that ERISA allows such an action **in narrowly appropriate circumstances**." *Free*, 732 F.2d at 1337 (emphasis added). According to the Trustee, the only "narrowly appropriate circumstances" are those involving the precise factual scenario at issue in that case: that of a fiduciary guilty of mere nonfeasance seeking recovery from a fiduciary guilty of malfeasance. *See*

SA32

*id.* at 1336-37 ("Whether ERISA allows a passive trustee to seek indemnification from a more culpable active trustee is not a wholly new question for this court.").

The Court, however, understands *Free* to hold that ERISA permits contribution or indemnity between co-fiduciaries, subject to general equitable principles. That is, indeed, what the Seventh Circuit said elsewhere in the opinion, when it approved of both its prior dicta and that of a trial court. *Id.* at 1337.[3] That is also what it said later in the opinion when it invoked "[g]eneral principles of trust law [that] provide for indemnification under the appropriate circumstances." *Id.* at 1338. That result also comports with the statutory language of 29 U.S.C. § 1109(a)—at issue in *Free*—which permits "such other equitable… relief as the court may deem appropriate." Thus, while a passive fiduciary may sometimes recover from an active one, other times it may not, depending on the circumstances in the case. And there may even be circumstances in which two active fiduciaries split the liability between them (after one of them has first made the beneficiary whole).

As for those general equitable principles, the Trustee agrees, [dkt. 69 at 10-11], that the Restatement (Second) of Trusts § 258, which *Free* cited approvingly, 732 F.2d at 1338,[4] correctly summarizes the liability of one fiduciary to another:

> (1) Except as stated in Subsection (2), where two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other, except that

---

[3] Specifically, the Court said: "We have previously recognized, albeit in dicta, that an ERISA fiduciary 'may seek indemnification or contribution from co-fiduciaries.' *Alton Memorial Hospital v. Metropolitan Life Insurance Co.*, 656 F.2d 245, 250 (7th Cir. 1981). In *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 635 (W.D. Wis. 1979), the court reached a similar result, once again in dicta, stating that a right to indemnification is within the equitable discretion of the court when faced with co-trustees liable under ERISA. We think that these cases reached the correct result…."

[4] The opinion actually cites to "§ 158." Based upon the context, however, the citation appears to be a typographical error.

SA33

(a) if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him; or

(b) if one of them receives a benefit from the breach of trust, the other is entitled to indemnity from him to the extent of the benefit; and for any further liability, if neither is more at fault than the other, each is entitled to contribution.

(2) A trustee who commits a breach of trust in bad faith is not entitled to contribution or indemnity from his co-trustee.

Restatement (Second) of Trusts § 258. Shared liability is, therefore, the default setting, unless and until one of the three exceptions applies.

In trying to argue that each of the three exceptions precludes any recovery here, the Trustee argues at length about all the facts that the Counterclaims do not allege. For example, "AUL has made no allegation, much less any plausible allegation, that the Trustee profited from ERISA violations." [Dkt. 69 at 13 (emphasis omitted).] But that tactic of argument misses the mark; the focus of a motion to dismiss is on what the Counterclaims say, not on what they don't say. *See Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) ("Any district judge…tempted to write 'this complaint is deficient because it does not contain. . .' should stop and think: What rule of law requires a complaint to contain that allegation? Rule 9(b) has a short list of things that plaintiffs must plead with particularity, but 'interception' is not on that list." (second ellipsis in original)). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007) (rejecting any suggestion that the Supreme Court was subjecting all complaints to the particularity requirements of Fed. R. Civ. Pro. 9). Indeed, to the extent that the three exceptions contained in the Restatement constitute equitable defenses, the Counterclaims needn't plead around them at all. *See Cancer Found., Inc. v. Cerberus Capital Mgmt.*, *LP*, 559 F.3d 671, 674-675 (7th Cir. 2009) ("Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and

SA34

overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness.").

Nothing in the Trustee's papers specifically disputes that the allegations actually made in Counterclaims satisfy the general rule: If AUL is a co-fiduciary and if it must pay the Plan, it should be permitted to recover, in whole or in part, from its co-fiduciary. The Counterclaims, therefore, survive the Trustee's motion to dismiss unless their allegations establish that one of the three exceptions applies. They do not.

With respect to the exception for "substantial fault," the Trustee argues that because he didn't do anything wrong while AUL did, AUL necessarily has substantially more fault than the Trustee. [Dkt. 74 at 6.] That argument, however, rests upon an assumption that the Trustee is in fact blameless, an allegation that appears nowhere in the Counterclaims. Far from it: The Counterclaims note that the Trustee himself admitted that he failed to "effectively discharge [his] duties to defray reasonable expenses of administering" the Plan. [Dkt. 1 ¶72 (alteration and quotation omitted).] While the Trustee backpedals away from his earlier allegation by arguing that the allegation was made contingent upon AUL not being held to be a fiduciary, [*see* dkt. 74 at 1], the Complaint says otherwise—the claim was made "irrespective of AUL's status as an ERISA fiduciary," [dkt. 1 ¶68]. Furthermore, even if the Trustee can finely parse away his statement, that type of parsing is inappropriate on a motion to dismiss, where the non-moving party receives the benefits of the inferences. And the fact that the Trustee said what he said doesn't evaporate merely because the Court ultimately dismissed the count of the Complaint that contained that statement; it remains an admission of a party opponent. *See* Fed. R. Evid. 801(d)(2). Besides, the Counterclaims allege that the Trustee agreed to enter into the contract with AUL and exer-

SA35

cised his ultimate authority to select the investments made available to the Plan.  [Dkt. 67 at 24-25 ¶¶11-12.]

Under those circumstances, the Court cannot find as a matter of law that the Trustee bears no responsibility for the amount and allocation of expenses that he now contends violate ERISA.[5]

The second exception under the Restatement—one fiduciary's receipt of benefit—also doesn't necessarily apply here.  Absent a situation in which one fiduciary is more at fault than the other, the exception only applies to the extent of the benefit received, after which contribution is permitted.  Restatement (Second) of Trusts § 258(1)(b).  Because the Trustee declined AUL's invitation to dismiss with prejudice any claim for damages above the disgorgement of the allegedly improper benefit, [compare dkt. 70 at 12, with dkt. 74 at 9 (saying only that he is "currently unaware of any other 'damage'")], a damage award might exceed AUL's benefit.  If so, depending on the relative culpability of the parties—which as explained above, the Court can't assess here—this exception may not apply either.[6]

The final exception precludes a claim contribution and indemnity by a fiduciary who has acted in bad faith.  The Trustee's only argument for this exception is that AUL, as a fiduciary, is presumed to know that the fee practices at issue here were illegal.  The support the Trustee offers for that proposition depends on some artful use of ellipses that obscure the actual meaning of the opinion, which in any event arose in the context of deciding whether a fee award should issue in an employment case that settled, a situation far different than that here.  Compare [dkt. 69 at 14

---

[5] The Court notes that the Trustee has failed to rise to AUL's challenge to cite a single case that has made the substantial-fault determination on at the motion-to-dismiss stage, [compare dkt. 70 at 9-10, with dkt. 74 at 6-7].  Further factual development may be particularly appropriate to decide whether the Trustee has taken sufficient measures after this action began to mitigate any losses that the Trustee alleges the fee arrangement is causing the Plan.

[6] AUL doesn't dispute that it may not seek contribution or indemnity under this exception for "disgorgement or restitution in the amount of the revenue sharing payments, less the fair market value of the services."  [Dkt. 70 at 12 (quotation omitted).]

SA36

(offering the following citation: "*Jones v. Local 4B, Graphic Arts Int'l Union*, 595 F. Supp. 792, 795 (D.D.C. 1984) ('fiduciaries…have a duty to their beneficiaries, they have a greater responsibility to obey the law…and, are presumed to know the law')"], *with Jones*, 595 F. Supp. at 795 ("However, while Union officers are fiduciaries and have a duty to their beneficiaries, they have a greater responsibility to obey the law. Union officers are the same as private employers, and, are presumed to know the law."). Besides, if every breach of fiduciary duty were always in bad faith, there would never be any contribution or indemnity between co-fiduciaries—even though the Restatement clearly contemplates shared liability as the default rule. [7] Certainly the heightened duties that fiduciaries have may help inform whether the fiduciary acted in good faith; they don't, however, automatically decide the question.

Because, based on the allegations in the Counterclaims, the Court cannot say that any of the three exceptions set forth in Restatement § 258 preclude contribution and indemnity, no dismissal is proper.

### C. 29 U.S.C. § 1105(a)

Although Counts I and II didn't explicitly mention 29 U.S.C. § 1105(a), the Trustee's opening brief also argued, out of an abundance of caution, that AUL shouldn't be able to rely on that statutory provision to obtain indemnity or contribution. That provision provides as follows:

> (a) Circumstances giving to liability. In addition to any liability which he may have under any other provision of this part [29 USCS §§ 1101 et seq.], a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

---

[7] Taking the Trustee's claim seriously—that as a fiduciary, AUL is automatically clairvoyant as to how the judiciary will decide this action—would also require finding that AUL's refusal to capitulate automatically violates Rule 11. The Court is quite certain that *Jones* is not the panacea that the Trustee maintains that it is with respect to the bad-faith exception.

SA37

(2) if, by his failure to comply with section 404(a)(1) [29 USCS § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary,   unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).  The Trustee cites case law holding that § 1105(a) doesn't provide a vehicle for contribution or indemnity as between co-fiduciaries.  *See Mutual Life Ins. Co. v. Yampol*, 706 F. Supp. 596, 598 (N.D. Ill. 1989) ("29 U.S.C. § 1105(a)…merely creates joint and several liability among co-fiduciaries in certain circum   stances and is silent on the issue of contribution.  Moreover, the Supreme Court has rejected the equation of joint and several liability with a right of contribution."  (footnote omitted)).

In the three brief paragraphs—unadorned with citations to any case law—that AUL offers relating to 29 U.S.C. § 1105(a), AUL doesn't dispute that this portion of  ERISA doesn't authorize contribution or indemnity.  Instead, it argues that, assuming that the Trustee's view of the law is correct, the Trustee's continued u se of AUL as the Plan 's service provider and the Trustee's failure to exercise reasonable care to prevent AUL malfeasance subject the Trustee to liability in his own right.  [*See* dkt. 70 at 12-13.]

But § 1105(a) isn't actually at issue in the Counterclaim s.  Any recovery under that statute, under AUL's view of it, would flow to the Plan, not to AUL; the re covery wouldn't constitute contribution or indemnity to AUL.  Because—unlik e Count V—AUL doesn't purpo rt to bring Counts I and II on behalf of the Plan, [ *see* dkt. 67 at 26-27], and because AUL doesn't dispute that § 1105(a) doesn't provide a basis for contribution or         indemnity as between co-fiduciaries, the Court finds that AUL hasn't stated a claim under § 1105(a) in Counts I and II.

### B.  Counts III and IV:  Common-law Contribution and Indemnity

Unlike in  *Free*, which involved a concession that federal common law didn't perm      it freestanding contribution or indem nity—that relief, if any, would have be grounded in ERI    SA

SA38

itself—AUL invokes federal common law in its Counts III and IV.      *Free*, 732 F.2d at 1336

("Briody admits that a right to indemnity from a co-trustee cannot be   based upon the federal

common law.  The issue, then, is whether such a right can be found in   ERISA.").  The Trustee

moves to dismiss the claims as duplicative of Counts I and II.

In our constitutional system, it is Congress—not the federal judiciary—that is tasked with

making law, except for narrow instances in which the federal courts m   ay develop federal com -

mon law:  "those in which a federal rule of deci sion is necessary to pro tect uniquely federal in-

terests and those in which Congress has given the courts the power to develop substantive law."

*Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 640 (1981) (quotation and citations omitted).

Because the one paragraph defe nse of Counts III and IV that AUL offers doesn't specifi-

cally undertake the analysis that would perm it the making of new federal common law and be-

cause, in an y event, AU L doesn't as k the Court to create any broader relief than    that *Free* has

found ERISA itself already authorizes, the Court declines A UL's invitation to create new federal

common law.  The Court will, therefore, dismiss Counts III and IV.

### C.  Count V:  AUL's Claim on Behalf of the Plan for Breach of Fiduciary Duty

AUL's Count V asserts a claim  on behalf of the Plan against the Trustee for his own vi-

olations of fiduciary duty.  *See* 29 U.S.C. § 1132(a)(2) (permitting fiduciaries to sue on behalf of

the plan for violations of § 1109).  The Trustee denies that he has any fault that m ight make him

directly liable to the Plan.

The Court will not, however, address the validity   of Count V at this tim e.  By separate

order, the Court has directed the parties to add ress the possible conflict of interest that has arisen

between the interests of the parties and the Pl  an here.  Pru dence cautions against d eciding the

fate of Count V before that possi ble conflict issue has been resolv ed, so as not to  potentially in-

SA39

jure the rights of the Plan to argue that the Trustee might face direct liability to Plan.  The Court

will, therefore, deny the motion to dismiss Count V, but do so without prejudice.  At the appro -

priate time, either via Rule 12(c) or Rule 56(c), the Trustee may renew his arguments.

## IV.
### CONCLUSION

The        Court **GRANTS IN PART** and **DENIES IN PART** the Trustee's motion to dismiss,

[dkt. 68].  The motion is **DENIED** with respect to Counts I and II, except to the extent that those

counts rely upon 29 U.S.C. § 1105(a).  The motion is **GRANTED** with respect to Counts III and

IV.  The motion is **DENIED WITHOUT PREJUDICE** as to Count V.

04/25/2011

_Jane Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Klint L. Bruno
KOREIN TILLERY LLC
kbruno@koreintillery.com

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

SA40

Joel S. Feldman
SIDLEY AUSTIN LLP
jfeldman@sidley.com

Bart A. Karwath
BARNES & THORNBURG LLP
bart.karwath@btlaw.com

Robert L. King
KOREIN TILLERY, LLC
rking@koreintillery.com

Robert D. MacGill
BARNES & THORNBURG LLP
rmacgill@btlaw.com

Eric S. Mattson
SIDLEY AUSTIN LLP
emattson@sidley.com

Sarah H. Newman
SIDLEY AUSTIN LLP
snewman@sidley.com

Dennis P. Stolle
BARNES & THORNBURG LLP
dstolle@btlaw.com

Eric Hyman Zagrans
eric@zagrans.com

SA41

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2012, I electronically filed the foregoing Brief and Required Short Appendix of Plaintiff-Appellant Robert Leimkuehler with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Klint Bruno*

Attorney for Plaintiff Robert Leimkuehler