No. 12-1081

—————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
—————————————————

ROBERT V. LEIMKUEHLER,
Plaintiff-Appellant,

v.

AMERICAN UNITED LIFE INSURANCE CO.,
Defendant-Appellee.
—————————————————

On Appeal from the United States District Court
for the Southern District of Indiana
—————————————————

BRIEF OF THE SECRETARY OF LABOR AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT
URGING REVERSAL AND REMAND
—————————————————

M. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security

NATHANIEL I. SPILLER
Counsel for Appellate
and Special Litigation

STEPHEN A. SILVERMAN
Trial Attorney
U.S. Department of Labor
200 Constitution Ave., N.W., N-4611
Washington, D.C.  20210
(202) 693-5623

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

QUESTION PRESENTED ............................................................................ 1

STATEMENT OF INTEREST ...................................................................... 1

STATEMENT OF THE CASE........................................................................ 2

    1.  <u>Statement of facts.</u> ........................................................................ 2

    2.  <u>District Court decision.</u> ................................................................ 7

SUMMARY OF THE ARGUMENT ............................................................ 9

ARGUMENT ................................................................................................ 12

        Under The Terms of the GVA Contract, AUL Exercised Authority
        and Control Over the Plan's Investments and Acted as an ERISA
        Fiduciary When It Selected and Purchased Mutual Fund Share
        Classes for the Plan ........................................................................ 12

    1.  <u>AUL's Broad Discretionary Authority Made it a Fiduciary</u> ....... 12

    2.  <u>AUL's Obligations and Potential Liability as a Fiduciary</u> .......... 15

    3.  <u>Seventh Circuit Case Law Supports a Finding of Fiduciary
       Status</u>............................................................................................ 20

    4.  <u>AUL Could Have Avoided Fiduciary Status by Giving the Plan
       "Final Say" Over Share Class Selections</u>.................................... 22

CONCLUSION ............................................................................................ 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Federal Cases:**

Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.,
   713 F.2d 254 (7th Cir. 1983) ........................................................... 11, 13, 20, 21

Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,
   805 F.2d 732 (7th Cir. 1986) ........................................................ 11, 20

Free v. Briody,
   732 F.2d 1331 (7th Cir. 1984) ...................................................... 18-19

Hecker v. Deere & Co.,
   556 F.3d 575, reh'g denied
   569 F.3d 708 (7th Cir. 2009), ........................................................... 8 & passim

Hennessy v. Connecticut Gen. Life Ins. Co.,
   1985 WL 3943 (N.D. Ill. Nov. 14, 1985) ........................................... 20

In re Consolidated Welfare Fund ERISA Litig.,
   839 F. Supp. 1068 (S.D.N.Y. 1993) .................................................. 16

LaScala v. Scrufari,
   330 F. Supp. 2d 236 (W.D.N.Y. 2004) ............................................. 16

Leimkuehler v. American United Life Ins. Co.,
   2012 WL 28608 (S.D. Ind. Jan. 5, 2012) ......................................... 2 n.1

Leimkuehler v. AUL,,
   752 F. Supp. 2d 974 (S.D. Ind. 2010) .............................................. 24

Lowen v. Tower Asset Mgmt., Inc.,
   829 F.2d 1209 (2d Cir. 1987) .......................................................... 16

Marshall v. Kelly,
   465 F. Supp. 341(W.D. Okla.1978) .................................................. 17

Mertens v. Hewitt Assocs.,
   508 U.S. 248 (1993) ........................................................................ 27

**Federal Cases--(continued)**

Midwest Comm. Health Serv. v. American United Life Ins. Co.,
   255 F.3d 374 (7th Cir. 1986) ........................................................... 11, 20, 21, 26

Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,
   698 F.2d 320 (7th Cir. 1983) .................................................................. 11, 20, 21

Provident Life & Acc. Ins. Co. v. Sharpless,
   364 F.3d 634 (5th Cir. 2004) ........................................................................ 23 n.8

Reich v. Hosking,
   1996 WL 182226 (E.D. Mich. 1996).....................................................................19

Righi v. SMC Corp.,
   623 F.3d 404 (7th Cir. 2011) ................................................................... 10 n.4, 13

Russo v. PBGC,
   1991 WL 254570  (S.D.N.Y. Nov. 20, 1991).......................................................19

Smith v. Med. Benefit Adm'rs Group, Inc.,
   639 F.3d 277 (7th Cir. 2011) ...............................................................................16

**Federal Statutes:**

Employment Retirement Income Security Act of 1974 (Title I)
   as amended, 29 U.S.C. § 1001 et.seq.;

Section 2, 29 U.S.C. § 1001....................................................................................1

Section 3(21)(A), 29 U.S.C. § 1002(21)(A) ......................................... 9, 24 n.10

Section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) ............................... 1 & passim

Section 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) ........................................ 9 n.3

Section  404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) ................................. 7, 10, 15

Section 405(a)(1), 29 U.S.C. § 1105(a)(1) ........................................................19

**Federal Statutes--(continued)**

Section 406(b)(1), 29 U.S.C. § 1106(b)(1)................................................... 16, 17

Section 406(b)(3), 29 U.S.C. § 1106(b)(3)......................................... 7 & passim

Section 502, 29 U.S.C. § 1132...............................................................1

Section 504, 29 U.S.C. § 1134...............................................................1

Section 505, 29 U.S.C. § 1135...............................................................1

**Federal Rules:**

29 C.F.R. § 2510.3-101(h)(1)(iii) ....................................................... 3, 13

**Miscellaneous:**

H.R. Rep. No. 93-1280, (1974)
reprinted in U.S.C.C.A.N. 5038, 5077........................................ 13, 21

Secretary's Am. Br. at 22-23 available at
www.dol.gov/sol/media/briefs/main.htm. ................................. 24 n.10

Financial Industry Regulatory Authority, Understanding Mutual Fund Classes
available at http://www.finra.org/Investors/Protect Yourself/Investor
Alerts/MutualFunds/P006022 (last updated Oct. 6, 2008).......................... 15 n.7

97-15A, Department of Labor Advisory Opinion Letter
1997 WL 277980 (May 22, 1997) ................................................ 23 n.9

97-16A, Department of Labor Advisory Opinion Letter
1997 WL 277979 (May 22, 1997) ........................................... 22, 23 n.9

99-03A, Department of Labor Advisory Opinion Letter
1999 WL 64919 (Jan. 25, 1999) ................................................. 23 n.9

03-09A, Department of Labor Advisory Opinion Letter
2003 WL 2514170 (June 25, 2003) ........................................... 23 n.9

George G. Bogert & George T. Bogert, <u>The Law of Trusts and Trustees</u>,
§ 591 (rev. 2d ed. 1980) ......................................................................19

**Miscellaneous—(continued):**

Reasonable Contract or Arrangement Under Section 408(b)(2)-Fee Disclosure,
77 Fed. Reg. 5632 (Feb. 3, 2012) .............................................. 14 n.6

## QUESTION PRESENTED

Whether an insurance company that manages a separate account for ERISA-covered plans is subject to ERISA's fiduciary obligations to the extent it retains unilateral authority to change the mutual funds initially approved by the plans and to pick among mutual fund share classes that have different expense ratios, including share classes that generate undisclosed revenue-sharing fees for the insurance company.

## STATEMENT OF INTEREST

The Secretary has primary enforcement and regulatory authority for Title I of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.; see §§ 1132, 1134, 1135.  ERISA protects plan participants by imposing stringent standards on the fiduciaries who oversee, manage, and control plan assets.  Under ERISA's functional test of fiduciary status, a person is a fiduciary with respect to a plan to the extent that he "exercises any authority or control respecting management or disposition of [plan] assets."  29 U.S.C. § 1002(21)(A)(i).  The defendant insurance company managed a separate account for the benefit of an ERISA-covered plan pursuant to governing documents that gave it broad discretionary authority over the plan's mutual fund investments.  Nevertheless, the district court held that the defendant did not act as a fiduciary when – without disclosing the availability of less expensive alternative share

classes to the plan, nor advising the plan of its financial arrangements with the mutual funds – it invested plan assets in higher-cost mutual fund share classes that, pursuant to the defendant's revenue-sharing agreements with the funds, generated greater revenue for the defendant than available lower-cost alternatives.

The district court's opinion that the defendant did not act in a fiduciary capacity is in error because, construing the facts in the light most favorable to the plaintiff as is required for summary judgment, the defendant exercised broad discretion over the selection of mutual fund share classes. The opinion, if affirmed, would undermine ERISA's protection of plan assets by permitting an entity to assert broad discretionary authority over a plan's investments without being subject to ERISA's fiduciary obligations. The Secretary therefore has a strong interest in reversal of the grant of summary judgment for the defendant.

## STATEMENT OF THE CASE

1. <u>Statement of facts.</u> The plaintiff in this case is Robert Leimkuehler, the trustee of the Leimkuehler, Inc. Profit Sharing Plan (the "Plan"). SA 2-3.[1] In 2000, the Plan entered into a group variable annuity contract ("the GVA Contract") with defendant American United Life Insurance Company ("AUL"). <u>Id.</u> at 3.

---

[1] The Secretary cites to the Short Appendix as "SA" and the Joint Appendix as "JA." Unless otherwise noted, the Secretary relies on the district court's findings of fact from its January 5, 2012 grant of the defendant's motion for summary judgment, located at SA 1-26. <u>Leimkuehler v. American United Life Ins. Co.</u>, 2012 WL 28608 (S.D. Ind. Jan. 5, 2012)).

Under the terms of the GVA Contract, the Plan did not directly purchase shares in mutual funds, but rather bought "accumulation units" in a separate account administered and maintained by AUL, which in turn invested the Plan's contributions to the separate account in mutual fund shares.[2] Id. at 3-4. There is no dispute that the separate account held plan assets. Id. at 10; see also 29 C.F.R. § 2510.3-101(h)(1)(iii) ("when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity … [a] separate account of an insurance company"). Nor is there any dispute that AUL was responsible for managing the separate account, including exercising responsibility for accepting plan contributions, allocating contributions among participant accounts, holding all of the separate account's investments, and executing investment transactions. SA 3-4, 17.

During the time period at issue in this case, each of the mutual funds on AUL's lineup of investment options offered more than one class of shares. See SA 4. These different share classes represented investments in exactly the same mutual fund, but had different expense ratios (i.e., the fees and expenses charged

---

[2] AUL established a single separate account for all its 401(k) plan clients. JA 617. Within its separate account, AUL has created sub-accounts and invests each sub-account in a different mutual fund. Id. at 617, 630; see Br. of Plaintiff-Appellant Robert Leimkuehler, at 6.

against the fund's assets differed depending on which share class the investor

purchased).  See id.  As explained by the court, "[a]lthough Plan participants

control which mutual fund they want to 'buy,'. . . AUL alone decides which share

class that it will make available through the investment account.  It does not

specifically disclose to the Plan, or its participants, the different share classes

available or the one that it has selected."  Id.  Moreover, "AUL does not claim that

it selects for inclusion in its 401(k) offerings the share class with the lowest

expense ratio.  Rather it claims, and Mr. Leimkuehler does not dispute, that it

discloses the total expenses associated with the class of shares it has selected for

each mutual fund, in other words, the bottom-line figure that participants who

choose to invest in the fund must pay."  Id.  In particular, AUL provided an annual

report to the Plan disclosing "the net expense" that was associated with each of the

plan's investments, a number that reflected the total of the expense ratio of the

underlying mutual fund plus AUL's additional administrative charge of 1.25%,

which was uniform regardless of the fund selected.  Id.; JA 624 (§ 6.1).

    In addition to AUL's contractual obligations to hold and invest the assets in

the separate account, Section 3.3 of the GVA Contract granted AUL broad

authority to "make additions to, deletions from, substitution for, or combinations

of, the securities that are held by any Investment Account," limited only by the

proviso that "[w]here required under applicable law, we will not substitute any

shares attributable to your interest in any Investment Account without notice, your approval or Participant approval." SA 23; JA 619-20 (GVA Contract § 3.3). AUL also retained for itself the contractual right to unilaterally "'eliminate the shares of any of the eligible Mutual Funds'" and "'transfer assets from any Investment Account to another separate account of AUL or Investment Account.'" SA 23 (quoting JA 619 (GVA Contract § 3.3(a)). "AUL does not deny that those contractual rights implicate discretionary administration of the Plan." SA 23.

In practice, the Plan approved the separate account's initial lineup of mutual funds by signing off on a Table of Investment Accounts listing the mutual funds in which the separate account would invest. JA 630. AUL, in turn, invested the Plan's money in the funds identified in the Table of Investment Accounts. Id. at 617 (GVA Contract § 1.15). Individual plan participants directed their retirement investments to the various mutual funds in which the separate account invested. Id. at 679 ("AUL has no discretion or authority to alter or decline to execute any Plan participant investment instruction received through the AUL TeleServe system, unless such instructions are impossible to execute"). Neither the Table of Investment Accounts nor any other provision in the GVA Contract, however, referred to the particular share classes offered by the mutual funds in the separate account lineup, and nothing in the governing documents limited AUL's authority to

choose among the various share classes offered by those mutual funds.  See

generally JA 615-85 (GVA Contract and New Business Agreement).

AUL disclosed to the Plan that it would be charged a 1.25% administrative

fee for its services, but it did not disclose the separate revenue-sharing

arrangements it had with the various mutual funds.  SA 4; JA 624.  Under AUL's

revenue-sharing arrangements, AUL received additional compensation in exchange

for investing the separate account's assets in particular mutual fund share classes

with higher expense ratios.  SA 4-6.  As a result, AUL received higher fees for its

services than the stated 1.25% administrative charge that was expressly disclosed

to and approved by the Plan.

The district court found that "AUL's proffered justification for engaging in

revenue sharing is that the revenue reflects the value AUL provides to the mutual

fund for performing administrative services that the mutual fund would otherwise

have to perform and may not in fact want to perform, for example, keeping track of

many small accounts."  SA 5.  While the plaintiff "does not dispute that at least

some of the expenses that were shared with AUL offset some of the costs the Plan

would have otherwise had to pay AUL, . . . AUL does not dispute, that the offset

was not completely one-to-one over the period in questions."  Id.  In other words,

AUL earned more in revenue sharing payments than it would otherwise have

charged the Plan.  Moreover, while not cited in the district court's opinion, a senior

officer at AUL testified that the company considered the ultimate compensation it sought to receive when determining in which mutual funds and share classes to invest.  JA 335 ("We have a goal of what revenue sharing we want to receive from the investment companies. And that was part of the process . . . . [B]ecause the share classes pay different revenue amounts, then that would be something we would look at, at that time.").

    2.  <u>District court decision.</u>  The plaintiff brought this case as a class action. He asserts that, by holding and investing Plan assets pursuant to its contractual authority to select particular mutual funds and share classes, AUL acted as a fiduciary within the meaning of the statutory definition, which encompasses a person who "exercises any authority or control respecting management or disposition of its assets."  29 U.S.C. § 1002(21)(A)(i).  AUL's ongoing selection of more expensive share classes that gave AUL undisclosed "revenue sharing," the plaintiff alleges, violated ERISA's fiduciary duty of loyalty (29 U.S.C. § 1104(a)(1)(A)), as well as the statute's provision prohibiting a fiduciary from receiving "any consideration for his own personal account" from a party dealing with the plan "in connection with a transaction involving the assets of the plan." <u>Id.</u> § 1106(b)(3)); SA 4-7.

    AUL moved for summary judgment on the ground that it could not have violated ERISA's fiduciary duty and prohibited transaction provisions "because

they only apply to a 'fiduciary,' and it was not a 'fiduciary' with respect to the revenue sharing."  SA 7, 24-25.  The district court granted AUL's motion and, in doing so, rejected the plaintiff's "stated theory of the case" that AUL violated ERISA by "cho[osing] which mutual fund share class to select for inclusion in its investment accounts . . . on the basis of considerations of [undisclosed] revenue-sharing implications."  SA 8; see also id. at 23-24.

The district court reasoned that, under Hecker v. Deere & Co., 556 F.3d 575, 586, reh'g denied 569 F.3d 708 (7th Cir. 2009), AUL was free to limit the universe of mutual funds and share classes that it would make available to the Plan, without assuming fiduciary status with respect to the Plan's selection of the particular funds included on the investment lineup.  SA 13-15.  The court viewed the pre-selection of share classes, like the pre-selection of mutual funds, to be a matter of plan structure rather than day-to-day-management, and "agree[d] with AUL, . . . , that if a provider can [as Hecker 'suggested in dicta'] limit the mutual funds it will offer to plan sponsors [without incurring fiduciary responsibilities], it can likewise select to only deal with particular share classes."  Id. at 15.

Although the court acknowledged that AUL would have exercised the requisite fiduciary authority and control over plan assets if it had eliminated any of the pre-approved funds or substituted new funds or share classes for those initially selected, it concluded that AUL's ongoing practice of investing in the same funds

as initially designated did not make it a fiduciary.  SA 14-15, 17-18.  Under the

statutory definition, AUL was a fiduciary within the meaning of ERISA section

3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) only "to the extent" that it "exercised"

authority or control over plan assets.  Id. at 7-9.  In the court's view, AUL's

authority remained unexercised to the extent that it continued to invest in the same

mutual funds and share classes that it had initially made available and as long as it

continued to comply with participants' directions on the allocation of their

investments among the funds AUL made available to them.  Id. at 14-24.  The

court thus concluded that AUL was not a fiduciary "with respect to the revenue

sharing that took place here," and granted summary judgment in favor of AUL.  Id.

at 24-25. [3]

## SUMMARY OF THE ARGUMENT

Under ERISA's broad fiduciary definition, a person that "exercises any

authority or control respecting management or disposition of [plan] assets" is a

fiduciary.   29 U.S.C. § 1002(21)(A).  AUL managed the separate account that held

and invested the Leimkuehler Plan's assets pursuant to a contractual provision that

_____

[3]  The district court also held that (1) an individual can never be a functional
fiduciary under ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), unless he
exercises discretionary control or authority over plan assets and plan management,
SA 11-12; (2) AUL did not render "investment advice for a fee" under ERISA
section 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii), id. at 19-21; and (3) the
Department of Labor's issuance of a preliminary enforcement letter to AUL
asserting that AUL was a fiduciary did not alter the court's legal conclusion.  Id. at
15-17.

gave it unilateral authority to select and purchase the particular mutual fund shares in which the Plan's assets were invested.[4]   In accordance with the contract's terms, AUL exercised authority and control over the Plan's specific investments. Accordingly, AUL functioned as a fiduciary and was subject to ERISA's fiduciary obligations.

In particular, AUL invested the Plan's assets in share classes that resulted in the mutual funds' payment of revenue sharing to AUL, but that cost the Plan more than other available shares issued by the same fund.  AUL did not disclose the revenue sharing to the Plan, notify the Plan of the various share classes, or tell the Plan the identity of the particular share classes in which it had invested.  In combination with AUL's retention of broad discretion to invest Plan assets in mutual funds and share classes of its choosing, the limited disclosure about expenses and complete lack of disclosure about revenue sharing underscore the fact that AUL, not the Plan, had the "final say" (Hecker, 556 F.3d at 584) over the selection of mutual fund share classes, thus affirming AUL's fiduciary status and implicating the duty of loyalty, 29 U.S.C. § 1104(a)(1)(A), and the statute's prohibition on a fiduciary's receipt of "any consideration for his own personal

---

[4]  For purposes of this brief, the Secretary views the evidence in "the light most favorable to the nonmoving party" in accordance with the familiar standard for judicial review of summary judgment awards.  Righi v. SMC Corp., 632 F.3d 404, 408 (7th Cir. 2011)

account from any party dealing with such plan in connection with a transaction involving assets of the plan," 29 U.S.C. § 1106(b)(3).

The Seventh Circuit has repeatedly determined that an insurer's contract makes it a fiduciary when the contract confers substantial authority upon the insurer to manage plan assets. For example, this Court held that giving the insurer "the unilateral right to change the rate of return and annual premiums, and . . . power to amend the policy and alter its value constituted the requisite authority" over the plan's assets. Ed Miniat, Inc. v. Globe Life Ins. Group, Inc., 805 F.2d 732, 733, 738 (7th Cir. 1986); see Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co., 713 F.2d 254, 260 (7th Cir. 1983) ("CBOE") ("power to amend the contract . . . is not qualitatively different from the ability to choose investments"). Accordingly, as previously established in a case in which AUL was the defendant, "an insurer's discretionary authority or control over group insurance contracts purchased by employee benefit plans subjects the insurer to ERISA fiduciary standards." Midwest Comm. Health Serv. v. American United Life Ins. Co., 255 F.3d 374, 376 (7th Cir. 2001). Consistent with this Seventh Circuit authority, AUL was a fiduciary because it managed the separate account pursuant to an agreement that gave it unilateral authority to determine the plan's investments and to affect the value of those investments.

Contrary to the district court's opinion, the Seventh's Circuit's <u>Hecker</u> decision supports the view that AUL retained the "final say" over the Plan's investments by retaining for itself decision making authority as to share class selection.  Under the contract's terms, AUL, unlike the Fidelity company in <u>Hecker</u>, did not merely present investment options to an independent fiduciary for independent approval.  Instead, AUL retained unilateral authority over plan investments, and used that authority to receive undisclosed compensation.  Consequently, it was a fiduciary with respect to the revenue sharing that occurred with the Plan's assets.

ARGUMENT

**Under the Terms of the GVA Contract, AUL Exercised Authority and Control Over the Plan's Investments and Acted as an ERISA Fiduciary When It Selected and Purchased Mutual Fund Share Classes for the Plan**

   1. <u>AUL's Broad Discretionary Authority Made it a Fiduciary.</u>  AUL managed the separate account and made all of the account's investments pursuant to governing documents that, on their face, give AUL broad discretionary authority to unilaterally alter the Plan's investments, eliminate securities, transfer investments to other accounts, and choose the particular share classes in which the Plan invests.  There is no question that the separate account assets were plan assets, or that Congress specifically intended that "insurance companies are to be responsible under the general fiduciary rules with respect to assets held under

12

separate account contracts."  H.R. Rep. No. 93-1280 (1974), <u>reprinted in</u> 1974

U.S.C.C.A.N. 5038, 5077; 29 C.F.R. § 2510.3-101(h)(1)(iii).  Accordingly, there

was ample evidence in the record to support a finding that AUL acted as a

fiduciary under ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), which

broadly makes a person a fiduciary to the extent that he "exercises any authority or

control respecting management or disposition of [plan] assets."  <u>See</u> <u>CBOE</u>, 713

F.2d at 260 ("It is clear that Congress intended the definition of fiduciary under

ERISA to be broad.").

AUL's investment activities under the GVA Contract fall within the broad

sweep of the statutory definition.  Particularly in light of the requirement that, on a

motion for summary judgment, the courts "constru[e] all facts and draw[ ]

reasonable inferences in the light most favorable to the nonmoving party," <u>Righi v.</u>

<u>SMC Corp.</u>, 632 F.3d 404, 408 (7th Cir. 2011), AUL's motion for summary

judgment should have been denied because the evidence supports a finding that

AUL invested plan assets pursuant to an express grant of discretionary authority

that broadly permitted it to unilaterally "make additions to, deletions from,

substitution for, or combinations of, the securities that are held by any Investment

Account."  JA 619-20.  By its terms, the GVA Contract's only apparent limit on

AUL's unilateral authority to add, delete, and substitute Plan investments is the

proviso that "[w]here required under applicable law, we will not substitute any

shares attributable to your interest in any Investment Account without notice, your approval or Participant approval." Id. However, nothing in ERISA or any other applicable law of which we are aware would have meaningfully limited AUL's discretion or prevented AUL from using its unilateral authority to purchase less expensive share classes that would have returned more revenue to the Plan and less to AUL.[5]

While the governing documents appear to have reflected an agreement as to the initial mutual fund lineup, neither plan participants nor the Plan controlled in which specific share classes their assets would be invested, and the only thing that prevented AUL from choosing share classes that would have cost the Plan less and generated greater benefits for the Plan's participants was its decision not to do so. Instead, AUL exercised its discretionary authority to choose the particular share classes in which the separate account actually invested – and thereby enhance its own compensation – without even informing the Plan or its participants of the existence of multiple share classes, the particular share classes AUL actually selected, or AUL's revenue sharing arrangements with the mutual funds.[6] Thus,

---

[5]  The Secretary reads the contract to facially grant AUL broad discretionary authority over the Plan's investments, but she understands that further fact finding by the district court may be necessary to consider extrinsic evidence shedding light on the parties' mutual intent in agreeing to this contract.

[6]  The Secretary recently promulgated a final rule imposing fee disclosure requirements for fiduciaries and non-fiduciaries, effective July 1, 2012.

AUL exercised the requisite authority and control over plan assets to meet the statutory test of fiduciary status.

2. AUL's Obligations and Potential Liability as a Fiduciary. Fiduciary status under ERISA carries with it fiduciary obligations, As a fiduciary, AUL was obligated to act with undivided loyalty to the Plan and to avoid engaging in prohibited transactions (i.e., transactions that ERISA categorically prohibits because of the dangers posed by financial conflicts of interest and self-dealing). 29 U.S.C. §§ 1104(a)(1)(A) ("fiduciary shall discharge his duties solely in the interest of participants"), 1106(b)(3) ("fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan"). The mutual funds' various share classes differed in two principal respects: their expense ratios and the amount of revenue sharing they generated for AUL.[7] The funds' underlying investments were otherwise identical. Thus, if, as the plaintiff alleges, AUL used its discretion to choose share classes that were more expensive

Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure, 77 Fed. Reg. 5632 (Feb. 3, 2012).

[7] "Each class represents a similar interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge you different fees and expenses depending on the class." Financial Industry Regulatory Authority, Understanding Mutual Fund Classes, available at http://www.finra.org/Investors/ProtectYourself/InvestorAlerts/ MutualFunds/P006022 (last updated Oct. 6, 2008).

to the Plan because of the undisclosed revenue sharing that AUL stood to receive

from the mutual fund, it breached its obligation of loyalty and engaged in

prohibited self-dealing.   <u>Smith v. Med. Benefit Adm'rs Group, Inc.</u>, 639 F.3d 277,

281 (7th Cir. 2011) (discussing duty of loyalty); <u>Lowen v. Tower Asset Mgmt.,</u>

<u>Inc.</u>, 829 F.2d 1209, 1213 (2d Cir. 1987) (discussing self-dealing prohibition).

Under ERISA, AUL could not use its fiduciary authority over Plan

investments to increase Plan expenses or obtain undisclosed compensation from

third parties that offered investment products to the Plan.  An ERISA fiduciary

may not use its authority over plan assets to set its own compensation even if the

fiduciary believes that it is taking no more than is reasonable for its services – and

the district court here recognized that the additional cost associated with the

higher-expense shares did not merely offset the costs the Plan would otherwise

have incurred for AUL's services.  SA 5.  Instead, ERISA generally requires that

another fiduciary – one that has no financial stake in the compensation package –

determine the amount, timing, and nature of the compensation.  <u>See</u> ERISA §

406(b)(1) ("A fiduciary with respect to a plan shall not deal with the assets of the

plan in his own interest or for his own account"), § 406(b)(3); <u>cf. LaScala v.</u>

<u>Scrufari</u>, 479 F.3d 213, 221 (2d Cir. 2007) (defendant fiduciary breached ERISA

by unilaterally raising his salary); <u>In re Consolidated Welfare Fund ERISA</u>

<u>Litigation</u>, 839 F. Supp. 1068, 1070-74 (S.D.N.Y. 1993) (finding 406(b) violations

for fiduciary who set fees or commissions that would be received by companies he owned); Marshall v. Kelly, 465 F. Supp. 341, 353 (W.D. Okla. 1978) (defendant violated section 406(b)(1) by causing Plan to pay him $9,000). The dangers of abuse – and the need for fiduciary protections – are obvious, as reflected in the allegation that AUL deliberately sacrificed the Plan's interest in lower-cost share classes to promote its own financial interest in receiving hidden compensation. SA 8.

To be sure, AUL was a fiduciary only "to the extent" that it exercised the requisite authority, but the district court erred in concluding that the "to the extent" limitation contained in the fiduciary definition posed any impediment to finding that AUL exercised fiduciary authority in selecting particular share classes on the basis of its self interest in revenue sharing. The plaintiff's allegations – and AUL's revenue sharing – are directly tied to AUL's exercise of fiduciary authority. Neither the GVA Contract nor participants' investment directions required investment in specific share classes, although the choice of share class determined how much revenue the Plan and AUL would receive from investing in a particular mutual fund – the higher the revenue sharing, the less the Plan would receive vis à vis AUL and vice verse. Yet, AUL did not even disclose to the Plan or its participants the share class it selected or the existence of the other share class options offered by the designated mutual funds; and AUL also failed to disclose its

revenue sharing arrangements, which varied depending on the share class that AUL selected.  "To the extent" that AUL instead exercised its authority to invest in more expensive classes in which it had a financial interest, about which the plaintiff had no knowledge and thus no control, it was a fiduciary.

Thus, AUL's investment in particular share classes and the receipt of associated revenue sharing reflected the exercise of AUL's discretion, not the discretion of the plaintiff.  As AUL received, held, and invested new and existing plan contributions, it necessarily made discretionary decisions on the particular share classes that it would purchase and hold from a range of possible options. AUL could have invested in lower-expense shares in the exact same mutual funds, but instead chose to invest in shares that cost the Plan more and generated undisclosed fees for AUL. Accordingly, the Plaintiff has offered more than enough evidence to support a finding that AUL was a fiduciary subject to ERISA's stringent fiduciary obligations with respect to its selection of share classes for the Plan and its corresponding revenue sharing – and certainly enough to defeat AUL's summary judgment motion.

Moreover, even if AUL's investment of plan assets in mutual funds could somehow be construed as "unexercised" authority because AUL consistently invested plan assets in the same mutual funds and share classes, the Seventh Circuit has long held that a fiduciary may be liable for nonfeasance.  See Free v.

18

<u>Briody</u>, 732 F.2d 1331 (7th Cir. 1984). In <u>Free</u>, one of the trustees argued that he could not be held liable for his failure to take any action to protect the plan from losses caused by his co-trustee's misuse of plan assets. <u>Id.</u> at 1335. The Seventh Circuit rejected this position, finding "that Congress intended to make [trustees] liable for this type of nonfeasance." <u>Id.</u> A trustee "could not avoid liability . . . by simply doing nothing." <u>Id.</u> ("Briody's nonfeasance was a breach"); <u>see</u> 29 U.S.C. § 1105(a)(1) (co-fiduciary liability for "an act <u>or omission</u> of such other fiduciary, knowing such act <u>or omission</u> is a breach") (emphases added); <u>see</u>, <u>e.g.</u>, <u>Russo v. PBGC</u>, 1991 WL 254570, at *7 n. 5 (S.D.N.Y. Nov. 20, 1991) ("The legislative history of ERISA demonstrates Congress' intent to make even nonfeasance actionable"); <u>Reich v. Hosking</u>, 1996 WL 182226 (E.D. Mich. 1996) (defendant "had a duty to apprise himself of the plan's investments and loans and to reasonably assure himself that those investments were prudent and legal."). <u>See also</u> George G. Bogert & George T. Bogert, <u>The Law of Trusts and Trustees</u>, § 591(rev. 2d ed. 1980) ("Nonfeasance where there is a duty to act ought to be regarded as the equivalent of misfeasance."). Consequently, even if AUL's continuing and repeated use of its authority to invest in the same share classes could reasonably be characterized as nonfeasance, rather than misfeasance, AUL was a fiduciary with respect to share class selection and revenue sharing.

    3.  <u>Seventh Circuit Case Law Supports a Finding of Fiduciary Status.</u>  This Court has repeatedly and unequivocally stated that "an insurer's discretionary authority or control over group insurance contracts purchased by employee benefit plans subjects the insurer to ERISA fiduciary standards." <u>Midwest Comm. Health Serv.</u>, 255 F.3d at 376 (citing <u>Ed Miniat, Inc.</u>, 805 F.2d 738 (7th Cir. 1986); <u>CBOE</u>, 713 F.3d at 260)).  The cases "indicate that courts should read the contract between the plaintiff and defendant insurer to determine whether the contract gives the insurer management control over the assets covered by the contract." <u>Hennessy v. Connecticut Gen. Life Ins. Co.</u>, 1985 WL 3943, *6 (N.D. Ill. Nov. 14, 1985) (citing <u>CBOE</u> and <u>Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.</u>, 698 F.2d 320 (7th Cir. 1983)).

    Thus, in <u>Ed Miniat, Inc.</u>, this Court "looked to the terms of the policy that gave the defendants the unilateral right to change the rate of return and annual premiums, and found that their power to amend the policy and alter its value constituted the requisite authority over an asset of the plan." <u>Midwest Comm. Health Servs.</u>, 255 F.3d at 377 (citing <u>Ed Miniat, Inc.</u>, 805 F.2d at 733, 738). "Similarly, in [<u>CBOE</u>], we held that the insurer's ability to amend a group annuity contract and alter its value subject the insurer to ERISA fiduciary obligations." <u>Id.</u> (citing <u>CBOE</u>, 713 F.2d at 260 ("The power to amend the contract . . . is not qualitatively different from the ability to choose investments [and] Connecticut

General effectively determined what type of investment the Plan must make.")).

The <u>CBOE</u> court, in turn, cited <u>Peoria</u>, 698 F.2d 320, for the proposition that if the

plan had simply given the assets "to Connecticut General and said 'Invest this as

you see fit and we will use the proceeds to pay retirement benefits,' Connecticut

General would clearly have sufficient control over the disposition of Plan assets

and be a fiduciary under ERISA."  713 F.2d at 260.  Relying on these precedents,

the Court in <u>Midwest Community Health</u> held that "because AUL had

discretionary authority over the contract in its ability to amend the value of the

contract, AUL is an ERISA fiduciary."   255 F.3d at 377.

As these group annuity cases demonstrate, AUL was obligated to exercise its

broad contractual authority over plan assets and over the value of the Plan's

contract in accordance with ERISA's fiduciary provisions.  <u>See also</u>  H.R. Rep. 93-

1280 at 5077 ("insurance companies are to be responsible under the general

fiduciary rules with respect to assets held under separate account contracts.").  In

the instant case, as in the group annuity cases, the plaintiff handed over plan assets

to AUL and AUL had broad unilateral authority to affect the value of the plan's

investments, particularly through the selection of particular share classes with

higher or lower expense ratios.  As a result, the district court should have found

that AUL was obligated to adhere to ERISA's fiduciary obligations in exercising its

discretionary contractual authority to invest plan assets in particular mutual funds and share classes.

4. AUL Could Have Avoided Fiduciary Status by Giving the Plan "Final Say" Over Share Class Selections.  Instead of giving AUL broad unilateral authority over plan assets in its separate account, as in the group annuity cases just discussed, the parties could have structured the arrangement differently to avoid giving AUL fiduciary authority over the selection of mutual funds shares and share classes.  For example, in a 1997 Advisory Opinion, the Department made clear that an insurer could reserve the right to add, delete, or substitute funds without assuming fiduciary responsibility, "provided that the appropriate plan fiduciary in fact makes the decision to accept or reject the change," such as occurs when the contract provides for advance notice to an independent fiduciary for the plan who can then overrule the change or walk away from the arrangement without penalty.  AO 97-16A, 1997 WL 277979, at *1, *3 (May 22, 1997).  In the case covered by the Advisory Opinion, the parties' agreement ensured that the final say over the plan's investment stayed with a plan fiduciary independent of the insurance company, rather than with the company itself.  Id.  Thus, the arrangement provided that the insurer would notify the plan of any proposed change at least sixty days in advance, fully disclose any resulting fees that the fiduciary would receive, and give

the plan's independent fiduciary the right to reject the changes. Id.[8] In marked

contrast, the parties here – in a contract that was signed three years after this AO –

instead gave AUL unilateral authority over the selection of mutual fund shares

(and associated revenue sharing), and AUL accordingly assumed full fiduciary

responsibility when it held and invested the Plan's assets in particular share

classes.[9]

Similarly, in Hecker, this Court recognized that a service provider does not

act as a fiduciary merely because it chooses to present a limited range of pre-

selected investment options to an independent plan fiduciary for final approval.

556 F.3d at 583 ("the Trust Agreement gives Deere, not Fidelity Trust, the final

say on which investment options will be included. The fact that Deere may have

discussed this decision, or negotiated about it, with Fidelity Trust does not mean

that Fidelity Trust had discretion to select the funds for the Plans.") However, the

district court erred in concluding that Hecker also foreclosed fiduciary liability on

---

[8] "ERISA interpretations by the Department of Labor ('DOL') are given great
deference." Provident Life & Acc. Ins. Co. v. Sharpless, 364 F.3d 634, 639 (5th
Cir. 2004) (citation omitted) (relying on DOL regulations and advisory opinion to
interpret 'employee status' under ERISA).

[9] The Department has on other occasions "taken the position that if a fiduciary
does not exercise any authority or control to cause a plan to invest in a mutual
fund, the mere receipt by the fiduciary of a fee or other compensation from the
mutual fund in connection with the plan's investment would not in and of itself
violate section ERISA 406(b)(3)." Id. (citing AO 97-15A, 1997 WL 277980 (May
22, 1997)); see also AO 03-09A, 2003 WL 21514170 (June 25, 2003); AO 99-03A,
1999 WL 64919 (Jan. 25, 1999)).

the facts of this case based on reasoning that AUL simply limited the Plan's options
to a pre-selected universe of specific share classes.  SA 13-15; but see JA 45
(Leimkuehler v. American United Life Ins. Co., 752 F. Supp. 2d 974, 983 (S.D.
Ind. 2010) ("the Seventh Circuit [in Hecker] emphasized that its holding was based
on – and therefore limited to – the factual record before it")).  While the Secretary
agrees that a service provider does not become a fiduciary merely because it
presents a limited range of investment options to plan fiduciaries who then decide
whether the investments are appropriate, that principle has no application here.[10]

    Unlike Fidelity in Hecker, AUL retained broad discretionary authority over
the mutual fund and share class options on the Plan's investment menu, including
the right to unilaterally add, delete, and substitute other mutual funds and the right
to choose particular share classes without prior approval by fiduciaries independent
of AUL.  Such control over plan investments is fiduciary authority fully subject to

---

[10]  The Secretary's amicus brief in Hecker stated that "she does not think that
Fidelity Research (or Fidelity Trust) became a fiduciary merely by virtue of
developing and presenting a list of investment options to Deere for its selection as
a fiduciary."  Secretary's Am. Br. at 22-23 available at
www.dol.gov/sol/media/briefs/main.htm.  However, as the Secretary also stated in
her Hecker amicus brief, if "Fidelity in fact made the selection regarding
investment options that would be available under the plan or otherwise exercised
discretionary authority in respect to the management or administration of the plan,
or meaningful control over its assets, this would be a sufficient allegation for
pleading purposes that the Fidelity defendants are fiduciaries within the meaning of
ERISA section 3(21)(A)."  Id. at 23.  AUL appears to fall within this latter point
made in the Secretary's Hecker analysis – certainly, sufficiently so to have
warranted denial of AUL's motion for summary judgment.

ERISA's fiduciary obligations and liabilities.   In contrast, there was no finding in Hecker that Fidelity, like AUL, retained discretionary authority over plan investment selection.  See Hecker, 556 F.3d at 584.  Hecker, accordingly, supports the Secretary's position, because AUL has the discretionary authority and "final say," id. that Fidelity lacked in Hecker.  The parties here did not merely agree that AUL could propose investments to the plaintiff for his pre-approval; they agreed that AUL could unilaterally make discretionary investment decisions with the plan assets that it held and invested in the separate account, and AUL in fact made such decisions by choosing in which share class to invest.

Moreover, the Plan trustee or participants could not have chosen the share classes because, as the district court recognized, AUL "does not specifically disclose to the Plan, or its participants, the different share classes available or the one that it has selected."  SA 4.  Nor did it disclose its own financial stake in the selection of higher-cost share classes.  Id. at 4-5.  Instead, it retained and exercised authority to select share classes that enabled it to receive undisclosed compensation in excess of the express 1.25% administrative charge for its services to the Plan.  In these circumstances, it is neither fair nor accurate to say that the plaintiff "pre-selected" the share class, much less that it exercised control over AUL's investment activities on an ongoing basis.  Only AUL knew about the various share classes and revenue-sharing arrangements, and only AUL chose the particular share

25

classes and effectively set its own compensation, while maintaining the contractual right to alter the investments at any time.

In short, <u>Hecker</u> did not overrule the Seventh Circuit decisions on the fiduciary status of insurance companies under group annuity contracts and it is those decisions, not <u>Hecker</u>, that should control the outcome here.  As those cases indicate, the relevant inquiry is whether the contract gave the insurer management control over plan assets. <u>See</u>, <u>e.g.</u>, <u>Midwest Comm. Health Serv.</u>, 255 F.3d at 376 ("We looked to the terms of the policy that gave defendants the unilateral right to change the rate of return and annual premiums, and found that their <u>power</u> to amend the policy and alter its value constituted the requisite authority over an asset of the plan") (emphasis added).

Consequently, this is not a case where the defendant successfully contracted out of being a fiduciary, and the fact that AUL consistently invested the Plan's assets in the same mutual funds and undisclosed share classes did not excuse it from ERISA's fiduciary responsibility provisions.  Under the logic of the district court's decision, an insurer, service provider, or trustee would have no fiduciary responsibility with respect to assets entrusted to its care and discretion, so long as it simply left the assets in the same investment, no matter how expansive its contractual authority or imprudent the investment.  This, however, is not the law. AUL managed the separate account, exercised its authority to make the separate

account's mutual fund investments, and acted, at all times, pursuant to a contract that gave it broad discretionary authority to invest in mutual funds and share classes of its own choosing.   The district court's conclusion that AUL failed to exercise its discretionary authority reflects an insupportably cramped view of the facts in this case and ERISA's text, which expansively provides that anyone who exercises "any authority or control" respecting the management or disposition of its assets is an ERISA fiduciary.  See, e.g., Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993).  Rather, consistent with this Court's recognition in its group annuity cases that when the contract gives discretion to the insurer over the type of investment or the return the Plan will receive for its investments, it is obligated to exercise its control in accordance with ERISA's fiduciary provisions, AUL exercised its discretionary authority every time it invested plan assets in particular share classes, regardless of whether it consistently chose to invest in the same, previously selected share classes.[11]

---

[11] The district court also erred by holding that an individual can never be a functional fiduciary under ERISA section 3(21)(A)(i) unless he exercises discretionary control or authority over plan assets and plan management.  See SA 11-12.  ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), states, in relevant part, that a person is a fiduciary to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." (emphasis added).  The plain language of the second, disjunctive part of the fiduciary definition confers fiduciary status on a person who exercises "any authority or control" respecting plan assets irrespective of discretion.  While the Seventh Circuit has not squarely addressed this question, this reading of the statute

## CONCLUSION

For the reasons stated above, the district court's opinion should be reversed

and the case remanded.

Respectfully submitted,

M. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security Division

NATHANIEL I. SPILLER
Counsel for Appellate and
Special Litigation
Plan Benefits Security Division

/s/ Stephen Silverman
STEPHEN SILVERMAN
Trial Attorney
Plan Benefits Security Division
U.S. Department of Labor
Room N-4611
200 Constitution Avenue, N.W.
Washington, D.C. 20210
(202) 693-5623 – Phone
(202) 693-5610 – Fax

---

is supported by the holdings of at least seven other circuits.  See Br. of Plaintiff-
Appellant Robert Leimkuehler, at 13-26.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

### FOR CASE NO. 12-1081

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    This brief contains <u>6,834</u> words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003, Times New Roman, 14 point font.

<u>/s/     Stephen Silverman</u>
Attorney for U. S. Department of Labor, Plan Benefits Security Division
Dated: June 1, 2012

### <u>CERTIFICATE OF VIRUS CHECK</u>

I hereby certify that a virus check, using McAfee Security VirusScan Enterprise 8.0, was performed on the PDF file of this brief, and no viruses were found.

<u>/s/     Stephen Silverman</u>
Attorney for U. S. Department of Labor, Plan Benefits Security Division
Dated: June 1, 2012

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2012, copies of the Brief were served upon

the parties by operation of the Seventh Circuit's CM/ECF system.

<u>s/ Stephen Silverman</u>
Stephen Silverman
Trial Attorney
Plan Benefits Security Division
U.S. Department of Labor
Room N-4611
200 Constitution Avenue, N.W.
Washington, D.C.  20210
(202) 693-5623 – Phone
(202) 693-5610 – Fax
silverman.stephen@dol.gov